THE STATE v. PRIVITT, Appellant.

Division Two, June 9, 1903.

1. **Information;** MURDER: WITH A GUN. The information set out in the opinion in this case, charging that defendant did murder deceased by shooting him with a shotgun, is held to be good.

2. ———: ———: "THEN AND THERE." The information charged the "giving to him, the said John W. Wolf, a mortal wound, of which mortal wound the said John W. Wolf did then and there in said county of Sullivan," instantly die. *Held,* that the information sufficiently states when and where the mortal wound was given.

3. ———: ———: WITH WHAT INSTRUMENT. From the information it appears that the assault was committed with a shotgun loaded with gunpowder and leaden balls, and that defendant then and there with said shotgun, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike the deceased, etc. *Held,* that this information sufficiently charges with what instrument the mortal wound was given.

4. ———: APPROVED PRECEDENTS. An information is not necessarily defective because it does not follow approved precedents. But it is the better rule to follow such precedents when that can be done.

5. **Hypothetical Question:** ESSENTIAL INGREDIENTS. In putting a hypothetical question to an expert witness, counsel has the right to assume the facts to be according to his theory of them. It is not essential that he should state the facts as they actually exist. Nor is such question improper simply because it includes only a part of the facts in evidence.

6. ———: ———: UPON EVIDENCE AS HEARD: BETTER PRACTICE. If there is no conflict in the evidence in regard to the mental condition of defendant, the court may in its discretion allow counsel to

State v. Privitt.

ask a hypothetical question upon the facts testified to by the witnesses, as the expert remembers them, without any recapitulation of the evidence. But the better practice in all cases where the facts are controverted or are not entirely clear, is to base the hypothetical questions to the expert upon the facts •claimed to have been proven by the evidence and recapitulated to him by counsel. This is the better practice because it enables the jury to know the facts upon which the expert's opinion may be based, and authorizes them to determine, as is their province, whether the facts on which the opinion is based have been proven. Otherwise, the expert must depend upon his memory as to the facts and predicate his opinion thereon, thus becoming himself the trier of the facts, which is a duty devolving upon the jury.

7. **Insanity:** EVIDENCE: RECENT DEED OF TRUST. It was not error, as bearing on defendant's insanity, for the State to read to the jury a deed of trust executed by him to the counsel four days after the homicide.

8. ———: INSTRUCTION FOR MURDER IN SECOND DEGREE: DEBAUCHING DEFENDANT'S WIFE. Where every element of murder in the first degree was present in the homicide, and the evidence clearly shows he was guilty of murder in that degree unless excusable on the ground of insanity, no instruction on murder in the second degree should be given simply because defendant killed deceased for debauching his wife several weeks after he had learned of the intimacy, and after he had entered into an armistice with deceased and had assured him that he need not fear harm from him. The case of State v. Grugin, 147 Mo. 39, is not authority for the contention that a homicide committed on such ground is only second degree murder.

9. **Instructions:** ABSTRACT LAW: WHEN HARMLESS ERROR. An instruction that presents mere abstract propositions of law, and which therefore has no place in the case, is not necessarily prejudicial error. Where the court clearly instructs that defendant is either guilty of murder in the first degree or excusable on the ground of insanity, and there is no probability that the jury was misled by an instruction which told the jury under what circumstances a man would be guilty of murder in the second degree or manslaughter for killing another guilty of adultery with his wife, the giving of such instruction is not reversible error, for the jury found defendant guilty of murder in the first degree, and the instruction was erroneous only because there were no facts on which to base it.

10. **Murder:** THREATS: CARRYING PISTOLS: SELF-DEFENSE. Unless the defense is self-defense, evidence that deceased had gone armed in expectation of meeting defendant, and had said that he might use such weapons on defendant, should not be admitted.

Appeal from Sullivan Circuit Court.—*Hon. Jno. P. Butler,* Judge.

AFFIRMED.

*A. W. Mullins* and *Wilson & Clapp* for appellant.

(1) If any fact, word or circumstance which forms a necessary ingredient in, or a material description of, the offense be omitted in the information, such omission vitiates the information, and of such vitiation the defendant may advantage himself by motion in arrest. State v. Hagan, 164 Mo. 659. It is an ancient rule that in an indictment (or information) nothing material shall be taken by intendment, or implication. 2 Hawkins P. C., chap. 25, sec. 60. The cardinal principle of pleading in prosecutions for felony is that everything constituting the offense must be pleaded with certainty and nothing left to be implied. State v. Furgerson, 152 Mo. 92; State v. Evans, 128 Mo. 406. The information does not conform to the established forms and precedents; in this, that it does not state when or where or with what instrument the mortal wound was given. It charges as follows: "giving to him, the said J. W. W. a mortal wound," and omits the words then and there, and thereby, or with the shot gun aforesaid. These words are found in all the established forms. 2 Bish. Crim. Pro. (2 Ed.), sec. 541; Kelley's Crim. Law and Prac., p. 309. (2) The two questions, and each of them, propounded to Dr. C. R. Woodson, as an expert, by one of the attorneys prosecuting for the State, were defective, insufficient and illegal, as hypothetical questions. (a) The first of said questions did not assume that the matters stated in the question were true, and while it called for the opinion of the witness on the whole case with respect to the sanity or insanity of the defendant it was not predicated, as it should have been,

Vol 175 mo—14.

on all the evidence in the case bearing on the question of defendant's insanity. Rogers on Expert Testimony (2 Ed.), p. 73, sec. 29; People v. Lake, 12 N. Y. 358; Com. v. Rogers, 7 Met. 500; Haggerty v. Railroad, 61 N. Y. 624; Webb v. State, 9 Tex. App. 490; Tingley v. Cowgill, 48 Mo. 297. (b) The second question is opposed to reason and well-established authority. By it Dr. Woodson was called upon to determine the facts for himself and did so, thus directly becoming the trier of the facts in place of the jury. This he had no right to do. Rogers on Expert Testimony (2 Ed.), p. 70, sec. 28; p. 61, sec. 26; p. 64, sec. 27; n. 1; Bennett v. State, 57 Wis. 69; 2 Greene on Evidence ( 7 Ed.), sec. 373, n. 1; Guiterman v. Steamship Co., 83 N. Y. 358; Reynolds v. Robinson, 64 N. Y. 589; 1 Greene on Evidence (7 Ed.), sec. 440; Dexter v. Hall, 15 Wall. 9; McMechen v. McMechen, 17 W. Va. 694; State v. Felter, 25 Iowa 74; Reed v. State, 62 Miss. 405; State v. Bowman, 78 N. C. 511. (3) In this case the jury were not instructed to disregard the evidence improperly admitted; for instance, the deed of trust. But even if they had been so instructed, the error of admitting it, it being of a character prejudicial to defendant, would not have been cured. State v. Mix, 15 Mo. 153; State v. Marshall, 36 Mo. 400; State v. Fredericks, 85 Mo. 145; State v. Kuehner, 93 Mo. 193; State v. Thomas, 99 Mo. 235.

*Edward C. Crow*, Attorney-General, and *C. D. Corum* for the State.

(1) The statement, in the information, of the time and place of giving the wound is sufficient. State v. Jones, 134 Mo. 259; Ball v. United States, 163 U. S. 662; Hughes' Crim. Law and Pro., sec. 75. (2) The hypothetical question embraced all of the material facts which there was any evidence tending to prove on the part of the State. It is not necessary that the hypo-

.thetical question should embrace all the facts. Counsel in framing a hypothetical question may base it upon a hypothesis of the truth of all the evidence, or upon a .hypothesis framed on certain facts assumed to be proved for the purposes of the answer. The question is ·not improper because it includes only a part of the evidence. It is 'not essential that counsel should assume ·the facts as they actually exist; but he may assume the facts in accordance with his theory of them. Cowley v. People, 83 N. Y. 464; Lovelady v. State, 15 Tex. App. .345; Rogers on Expert Testimony, p. 65; Quinn v. Higgins, 63 Wis. 664; Curr v. Lunsford, 31 W. Va. 660; State v. Duestrow, 137 Mo. 44. (3) The hypothetical ·question propounded to Dr. Woodson was proper· under the condition of the record in this case. It would be hard to conceive of a case where there is as little conflict in the evidence, upon the material facts, as· here. In truth, no conflict exists. Under such conditions, the general rule requiring that hypothetical questions should be based upon an assumed state of facts, does not ·exist, and there is no necessity for hypothetical questions. A medical expert who has been present during a trial and heard all the evidence, there ·being no dispute about the facts, may be asked his opinion about the whole matter. State v. Klinger, 46 Mo. 224; ·Coyle v. ·Commonwealth, 104 Pa. 117; Page v. State, 61 Ala. 16; Pidcock v. Potter, 68 Pa. St. 342; Rogers on Expert Testimony, p. 74. (4) There is another reason· why ·the court did not err in permitting ·this question to be ·asked: The only objection· interposed was · because the question did not state fully the law and that it omitted an essential ingredient to make it the law. Such an objection is of no ·force. All objections are made because, in the ·opinion of the objector, they did not comply with some rule of law,· and· to hold that this objection was sufficient would be in substance to hold· that any· objection is ;sufficient without specifying the reasons thereof. Power

v. Mitchell, 77 Me. 361; Railroad v. Falvey, 104 Ind. 409; State v. Rosenburg, 162 Mo. 331.

BURGESS, J.—On the 6th day of January, 1902, there was lodged in the office of the clerk of the circuit court of Sullivan county, by the prosecuting attorney of said county, an information charging the defendant, Newton J. Privitt, with murder in the first degree, in shooting and killing with a double-barrel shotgun, at said county, on the 26th day of November, 1901, one John W. Wolf. Thereafter in April, 1902, defendant was put upon trial in said court, and convicted of murder in the first degree. He appeals.

There is no dispute as to the facts which lead up to the homicide, which briefly stated are as follows:

"Newton Jasper Privitt, the defendant, is a married man and the father of several children. Sometime during the latter part of June, 1901, the defendant received an anonymous communication suggesting that his wife was unfaithful to her marital vows, and that their nearest neighbor, one Page Weston, was her paramour. On receipt of this communication, the defendant confronted his wife with its contents and she confessed that she had been guilty of criminal intimacy with John W. Wolf, the deceased; but denied that she was guilty of having committed this offense with Weston. She admitted that her liaison with Wolff had existed for about ten years.

"The defendant began to consider and to discuss with his friends what course he should pursue as to Wolf, and whether he and his wife should thereafter live apart. He sent word by his quondam brother-in-law to Wolf that he must leave the country at once. Wolf acquiesced to this and immediately began to prepare for his departure. It seems that Wolf was not able to so arrange his affairs as to be able to leave on the day fixed by defendant for his departure and an extension of the time was granted him. Wolf, after having

completed his arrangements, left Sullivan county and went to Oklahoma. He had not been gone long until defendant learned from his wife that she had also committed adultery with another person, to-wit, Page Weston, he being the person referred to in the anonymous communication. Prior to acquiring this information the defendant had made numerous threats against the life of Wolf; but on learning of his wife's further degradation, he stated that he 'could not kill all the people in the neighborhood.' He then arranged for a meeting with Wolf's wife, and requested her to send word to her husband that he might return home, and the defendant gave Mrs. Wolf his word of honor that no harm should come to her husband. Accordingly, Wolf returned home, after having been absent in Oklahoma for a period of about two weeks.

"Soon after Wolf's return home, the defendant again armed himself and began renewing his threats against the life of Wolf; but, being informed that Wolf was also armed and prepared to meet any assault that defendant might make upon him, he then requested his informant to see Wolf and to advise him if he, Wolf, would never come to defendant's home again, would never speak to defendant's wife or his minor children, and lay aside his arms, he, the defendant, would also lay down his arms, and their trouble would be settled. To this proposition Wolf assented, and the defendant, on being advised of Wolf's consent, said, 'All right, that settles it.' Thereupon another armistice was declared. This was during the month of July.

"The record does not disclose that either party failed to carry out this agreement or that there was a renewal of hostilities in any manner, until the 26th day of November, 1901. On that day the deceased, accompanied by his wife and two children, was on his way to the town of Osgood. Their way ran past the farm which was owned by the defendant and on which he was then building a new house. Immediately after

the deceased and his family had passed the point where defendant and his men were engaged in digging a well, the defendant made inquiry of his son whether it was not deceased who had passed. At first his son was uncertain as to the identity of the persons passing; but he made a closer observation and then assured his father that it was Wolf and his family who had passed. The son and the father then held a whispered conversation. The defendant immediately repaired to his home which was about one-quarter of a mile distant from the well and procured his shotgun and returned to the well. He ordered the removal of the man who was at the bottom of the well therefrom, and then ordered his men to unhitch the horse which was being used to draw dirt from the well, and said, 'I will show him how he will break up my family.' He then mounted the horse which had been unharnessed by his direction, and rode rapidly in pursuit of the deceased and overtook him about three-quarters of a mile from the well. He called on the deceased to halt, but before the deceased had even time to turn his body, the defendant shot him in the back, inflicting a mortal wound. The deceased either attempted to get out of the wagon or fell out, whereupon defendant dismounted and walked to where deceased was and emptied the other barrel of his gun into the head of the deceased, tearing the whole cranium away. He then remounted his horse, returned to the well, and advised the persons there that he had accomplished his purpose, disappeared and was gone for several days.

"The defendant interposed a plea of insanity. The evidence on his part tended to show that after he had been advised of his wife's shame, he was melancholy in mind and depressed in spirit; that he was not given to levity and jocosity that had been his wont."

The court at the instance of the State, over the objection and exception of defendant, instructed the jury as follows:

"1.   The defendant in this case stands charged by information with murder in the first degree, that is to say, the defendant, Newton Jasper Privitt, stands charged with having feloniously, willfully, premeditatedly, deliberately and of his malice aforethought, shot and killed John Wolf, at the county of Sullivan, on the 26th day of November, 1901, and under the evidence in this case, you will either convict the defendant of murder in the first degree, and so state in your verdict, or you will acquit him.

"2.   It is the duty of the court to instruct you on all questions of law arising in this case, and it is your duty to receive such instructions as the law of the case, and find the defendant guilty or not guilty, according to the law as declared by the court and the evidence as you have received it under the instructions of the court.

"3.   If the jury believe and find from the evidence in this cause that the defendant, Newton Jasper Privitt, in the county of Sullivan, and State of Missouri, on or about the 26th day of November, 1901, did feloniously, willfully, deliberately, premeditatedly and of his malice aforethought make an assault upon John Wolf with a certain loaded gun, and then and there with said gun, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill said John Wolf by shooting him upon the head and body, and thereby inflicting upon him a mortal wound of which said wound he immediately died at said county of Sullivan, during said month of November, 1901, and was thus killed by the shooting aforesaid, as charged in the information, then you will find the defendant guilty of murder in the first degree, and so state in your verdict.

"He who willfully, that is, intentionally, uses upon another at some vital part a deadly weapon, such as a loaded gun, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act.   He

who so uses such deadly weapon, without just cause or provocation, must be presumed to do it wickedly and from a bad heart. If, therefore, you find and believe from the evidence in this case that the defendant took the life of John Wolf by shooting him in a vital part with a gun, with the manifest design to use such weapon upon him, and with sufficient time to deliberate and fully form the conscious purpose to kill him, and without sufficient or just cause or provocation, then such killing is murder in the first degree; and while it devolves upon the State to prove willfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet this need not be proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if you can satisfactorily and reasonably infer their existence from all the evidence, you will be warranted in finding the defendant guilty of murder in the first degree.

"3a.   As used in the information and in these instructions 'felonious' means wrongfully and wickedly, and also refers to the punishment imposed by law. 'Willfully' means intentionally and not done by accident. 'Premeditatedly' means thought of beforehand for any length of time, however short. 'Deliberately' means done in the cool state of the blood, not in sudden passion, engendered by lawful or some just cause of provocation. And the court instructs the jury that in this case there is no evidence tending to show the existence of any such passion or provocation. 'Malice' means that condition of the mind which prompts one to do a wrongful act intentionally without legal justification or excuse. It does not mean mere spite, hatred or ill will, but signifies that state of disposition which shows a heart regardless of social duty and fatally bent on mischief; and 'malice aforethought' means that the act was done with malice and premeditation. 'Malice,' as used here, may be presumed from the intentional

use of a deadly weapon in a manner likely to produce death.

"4.    To the charge made against the defendant of the taking of the life of John Wolf the plea of insanity is interposed, in other words, under the plea of not guilty the defendant may, as he does, rely upon insanity as a defense to the charge made against him.    And it is for you to determine, from all the evidence in this case, the validity of such or any defense interposed. Insanity, if satisfactorily shown by the evidence, is a valid defense, but before the defendant can be acquitted of the shooting and taking the life of John Wolf in the manner he did, by reason of insanity, the jury must believe from all the evidence that at the time of the taking of the life of the said John Wolf he was not in possession of his faculties, and was incapable of appreciating the moral qualities of his act and of distinguishing between right and wrong in respect to said act; in other words, in order to hold the defendant criminally responsible for taking the life of John Wolf, it is only necessary that the jury be satisfied from all the evidence that he had sufficient mental capacity to distinguish between right and wrong as to the particular act with which he so stands charged.    And if the defendant at the time of the said killing had sufficient mental capacity to distinguish between right and wrong as to said act, and knew that his act was criminal and wrong, and would deserve punishment, then in law he had a criminal intent and was not so insane as to be exempt from the responsibilities of his act.    And in this connection the court further says to the jury that excitement or frenzy arising from the passion of anger, hatred or revenge, no matter how furious, if not the result of a diseased mind, is not legal insanity, and the jury should not confound excitement, anger or wrath or acts done or committed in either or both or in revenge with actual insanity, insanity recognized by law. Because it is only legal insanity, a disease of the brain,

rendering a person incapable of distinguishing between right and wrong, with respect to the offense charged, that excuses the commission of such act. The doing of such act in frenzy, hatred or revenge or by reason of some irresistible impulse to avenge some former wrong or grudge, does not excuse.

"5. The jury will observe from all the instructions given to them either upon the part of the State or the defendant, that under the law the defendant had no right to kill John Wolf because of his knowledge or suspicion of deceased and defendant's wife having previously had illicit intercourse. The law is that where a man finds his wife in the act of adultery and at the moment kills the adulterer, the law, while not justifying even under these circumstances, the taking of life, will lessen the offense to manslaughter. And the law is further, that if a husband, upon hearing of such adultery, immediately before he has had time to reflect and before having formed the conscious purpose or design to take life, pursues and kills such adulterer, such killing will be murder in the second degree, but the jury will bear in mind that under the law, to reduce the killing under the circumstances stated to manslaughter, the person killed and the wife of the slayer, must by such husband, be found in the act of adultery, and such killing then and there done. And to reduce the taking of life to murder in the second degree by reason of hearing of adultery between the person slain and the wife of the slayer, such killing must be done immediately upon the hearing of such adultery, before time has been had to reflect and the conscious purpose formed to take such life. And, in no event can a person, where he has been informed, suspected and known for days, weeks or even months, of the adultery of his wife with another prior to taking the life of such other, be in anywise justified, excused or his crime mitigated in the taking of the life of such other under the circumstances and after

the knowledge herein stated. And the so taking of life because of such knowledge or information, in order to avenge said acts after having formed the conscious purpose to kill, renders the person so taking such life guilty of murder in the first degree. And in this case under the law and facts, there is nothing to reduce the killing of John Wolf to either murder in the second degree or manslaughter, but the jury must find defendant guilty of murder in the first degree or acquit him upon the ground of insanity; and in this connection the court says to the jury that if you find the defendant guilty of murder in the first degree you will simply so state in your verdict.

"6. The jury are further instructed that excitement, passions and angered feelings or revenge produced by motives of anger, hatred or revenge is not insanity, and that the law holds the wrongdoer of an act under such conditions responsible for his acts and the jury have no right to excuse or in anywise justify or mitigate defendant's act in the taking of John W. Wolf's life, except they can so do under and according to the law.

"7. The jury will observe from all the instructions given them, those upon the part of the State as well as defendant, that under the law the defendant had no right to kill John W. Wolf because of his knowledge, or suspicion of deceased and defendant's wife having previously had illicit intercourse. And in this case if the defendant after having suspected or known for days, weeks or even months of the intimacy of his wife and John W. Wolf, by reason thereof, and after having formed a conscious design and purpose to kill said Wolf, did kill said Wolf, the so killing of said Wolf was and is under the law murder in the first degree, and the jury should so find.

"8. In determining as to the guilt or innocence of the defendant you should take into account the testimony in relation to his character as a moral man, and

you should give to such testimony such weight as you deem proper; but if from all the evidence you are satisfied beyond a reasonable doubt as defined in these instructions that the defendant is guilty, then his previous good character, if shown, can not justify, excuse, palliate or mitigate the offense, and you can not acquit him merely because you believe he has been a person of good repute.

"9. The reasonable doubt mentioned and referred to in these instructions means a substantial doubt arising out of the evidence, and not a mere possibility of the defendant's innocence."

On the part of defendant the court instructed the jury as follows:

"1. The information in this case is a mere formal charge against the defendant, and of itself is no evidence whatever of his guilt, and no juror should permit himself to be in any degree or to any extent influenced by it.

"2. If, after fully and deliberately weighing and considering all the evidence before them in this case, the jury entertain any reasonable doubt of the defendant's guilt, they must give him the benefit of such doubt and acquit him. A juror is understood to entertain a reasonable doubt when he has not an abiding conviction of mind founded on the evidence to a moral certainty that the defendant is guilty as charged.

"3. The court instructs the jury that insanity is interposed by counsel for defendant as an excuse for the charge set forth in the information. This defense when established is one the law recognizes and entitles the defendant to be acquitted altogether. Insanity is a physical disease located in the brain, and is either partial or general; and which disease so perverts and deranges one or more of the mental and moral faculties so far as to render the person suffering from the affliction incapable of distinguishing right from wrong in reference to the particular act charged against him,

and incapable of understanding that the particular act in question was the violation of the law of God and of society. Wherefore the court instructs the jury that if they believe and find from the evidence that at the time he did the killing charged in the information the defendant was so perverted and deranged in one or more of his mental and moral faculties as to be incapable of understanding at the moment he killed John W. Wolf that such killing was wrong, and that he, the defendant, at the time was incapable of understanding that this act of killing was a violation of the law of God and of society, if the jury find he was so insane, they should find him not guilty.

"4. If the jury believe and find from the evidence that the mind of the defendant, Newton Jasper Privitt, was unbalanced, diseased and disordered at the time he shot and killed the deceased, John W. Wolf, and in such condition in regard to that particular act that he did not have sufficient intelligence, reason and will to enable him to distinguish between right and wrong in respect to said act, and to know and understand that it would be wrong, and that he would deserve punishment by committing it, and at the time sufficient mental power to control the impulse of his own disordered mind, then the defendant is not guilty as charged in the information, because of his disordered mind, and upon that ground the jury should acquit him.

"5. The court instructs the jury that to establish the insanity of the defendant with respect to the act charged against him in the information, positive and direct proof of it is not required. To entitle him to an acquittal by reason of his insanity at the time of the killing of said John W. Wolf, by defendant, circumstantial evidence which reasonably satisfies the mind of its existence is sufficient. As the law presumes the defendant innocent, the burden of proving him guilty rests with the State, and before you should convict him his guilt must be established beyond all reasonable doubt.

"The previous good character of the defendant if proved to your satisfaction is a fact in the case which you ought to consider, together with all the other facts in evidence, in passing upon the question of his guilt or innocence of this charge; for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good.

"7.    The testimony given by the physician and expert who testified in this case is to be taken and considered by the jury like the evidence of the other witnesses who testified in the cause; and the opinions on questions of insanity, which have been given by the medical expert, are subject to the same rule of credit or discredit as the testimony of the other witnesses, and are not conclusive on the jury.    These opinions neither establish nor tend to establish the truth of the facts upon which they are based; whether the matters testified to by the witness in the cause as facts, are true or false, is to be determined by the jury alone, and you must also determine whether the facts and matters stated and submitted to experts in the hypothetical questions are true in fact, and have been proven in this case.

"8.    Under the law of this State the defendant is presumed to be innocent of the crime charged against him, and so strong is this presumption that it clings to him, surrounds, shields and protects him, through the entire trial of this case, and until such presumption is overcome by evidence which proves his guilt beyond a reasonable doubt.    Such evidence, in order to warrant a conviction, must be clear, satisfactory and abiding, fully satisfying the mind and conscience of each and every juror.    It is not sufficient, in a criminal case, to justify a verdict of guilty, that there may be strong suspicion or even strong probability of guilt, but the law requires proof by legal and credible evidence of such a nature that, when it is all considered, it produces a clear, undoubting and entirely satisfactory conviction of the defendant's guilt.    The burden of proof

is upon the State to make out and establish by the evidence, beyond a reasonable doubt, and to the satisfaction of the jury, every fact and circumstance necessary to prove his guilt; and unless his guilt is so established, the jury must find him not guilty.''

The defendant also prayed the court to instruct the jury as to the law of murder in the second degree, but the court failed and refused to do so, to which failure and refusal of the court to so instruct the jury, the defendant then and there excepted at the time.

The defendant also objected and excepted to the failure of the court to instruct the jury upon all questions of law arising in the case and necessary for their guidance in the determination of their verdict, and saved his exceptions.

The information, leaving off the formal parts, is as follows: ''That one Jasper Privitt on the 26th day of November, 1900, at the county of Sullivan, in the State of Missouri, then and there being, in and upon one John W. Wolf, then and there feloniously, willfully, deliberately, premeditatedly, on purpose, and of his malice aforethought, did make an assault, and with a dangerous and deadly weapon, to-wit, a double-barrel shotgun, then and there loaded with gunpowder and leaden balls, which he, the said Jasper Privitt, in his hands then and there had and held at and against him, the said John W. Wolf, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot off and discharge, and with the double-barrel shotgun aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike him, the said John W. Wolf, on the body and head of him, the said John W. Wolf, then and there with the dangerous and deadly weapon, to-wit, the double-barrel shotgun aforesaid, and the gunpowder and leaden balls aforesaid, in and upon the body and head of him, the said John W. Wolf, giving to him, the said John

W. Wolf, a mortal wound, of which mortal wound the said John W. Wolf, did then and there, in said county of Sullivan, instantly die.

"And the said James R. Page, the prosecuting attorney aforesaid, under his oath of office aforesaid, does say that the said Jasper Privitt, him the said John W. Wolf, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did kill and murder, against the peace and dignity of the State."

It is said for defendant that the information is invalid in that it does not state when or where or with what instrument the mortal wound was given or that the wounding was felonious. But this seems to us to be a misinterpretation of the information.

It does not omit the words "then and there," after the words, "giving to him, the said John W. Wolf, a mortal wound," as contended by defendant, but expressly avers, "giving to him, the said John W. Wolf, a mortal wound, of which mortal wound the said John W. Wolf did then and there, in said county of Sullivan, instantly die." It clearly appears from the information that the assault was committed with a shotgun loaded with gunpowder and leaden balls, and that the defendant then and there with said shotgun, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike the deceased, giving to him a mortal wound, of which wound said deceased, in Sullivan county did instantly die. This seems to us to be a sufficient averment of the time and place of giving the wound and the cause of the death.

The information is in all material respects like the indictment in the case of the State v. Jones, 134 Mo. 259, which was held to be good by this court.

So in United States v. Ball, 163 U. S. 663, it was held that an indictment for murder which alleges that Millard Fillmore Ball, John C. Ball and Robert E. Boutwell, at a certain time and place, by shooting with

a loaded gun, inflicted upon the body of William T. Box a mortal wound of which mortal wound the said William T. Box did languish, and languishing did then and there instantly die, unequivocally alleges that William T. Box died of the mortal wound inflicted by the defendants, and that deceased died at the time and place at which the mortal wound was inflicted.

While the better rule in preparing indictments and informations is to follow approved precedents when it can be done, they are not necessarily defective because they fail to do so, but if they contain all necessary averments though couched in different language from approved forms and precedents, they will be held good. The information in this case we think sufficient.

The next question presented by this appeal is with respect to the admission of the expert evidence of Dr. C. R. Woodson, which defendant claims was erroneously admitted; not upon the ground that he was not qualified, but upon the ground that the hypothetical question propounded to him leaves out nearly all the essential ingredients in the case. To another question of a similar character defendant objected, upon the ground that the question is incompetent, because it does not state the law in that regard, it omits an essential ingredient to make it the law. We are not advised what essential ingredients in the case were omitted from the hypothetical questions propounded to the witness, and are, therefore, not able to appreciate the full force of the objections. It is, however, said that the first of said questions does not assume that the matters stated in the question *were true*, and while it called for the opinion of the witness on the whole case with respect to the sanity or insanity of the defendant, it was not predicated, as it should have been, on all the evidence in the case bearing on the question of defendant's insanity. In putting hypothetical questions to the expert witness, counsel for the State had

Vol 175 mo—15

the right to assume the facts in accordance with his theory of them; it was not essential that he should have stated the facts as they actually existed. [Cowley v. People, 83 N. Y. 464; Lovelady v. The State, 14 Tex. App. 545; Quinn v. Higgins, 63 Wis. 664; Kerr v. Lunsford, 31 W. Va. 659.] Nor is such a question improper simply because it includes only a part of the facts in evidence. [Rogers on Expert Testimony (2 Ed.), 65.]

With respect to the other question, there was very little conflict in the evidence in regard to the facts and circumstances which led up to the homicide, and defendant's mental condition at that time, and recently thereafter. The expert witness was present during most of the trial, and heard all the evidence in regard to the mental condition of defendant, except the testimony of one witness which was stated to him by counsel for the State, and under such circumstances there was no reversible error in allowing him to express his opinion as to defendant's mental condition at the time of the homicide predicated on the evidence as he heard it, and as stated to him. [State v. Klinger, 46 Mo. 224.]

In McNaghten's case, 10 Clark & Finnelly 200, it was held that where an accused person is supposed to be insane, a medical man, who has been present in court and heard the evidence, may be asked as a matter of science, whether the facts stated by the witnesses, supposing them to be true, show a state of mind incapable of distinguishing between right and wrong.

In the case of Gitchell v. Hill, 21 Minn. 464, it was said that "the trial court may, in its discretion, as a matter of convenience, permit the hypothesis to be put to the witness, by referring him to the testimony, if he has heard it, instead of requiring the counsel to recapitulate it."

The rule seems to be that "when, in a proper case for expert testimony, the facts are admitted, or proved by evidence which is not conflicting, the opinion of an expert upon such facts is admissible as a scientific de-

duction.'' [Coyle v. Commonwealth, 104 Pa. St. 117.]

Defendant, however, contends that as only the evidence of one witness was stated to the expert, Dr. Woodson, with respect to the evidence of all the other witnesses who testified as to the mental condition of the defendant, or such of them as Dr. Woodson may have heard testify, he as the expert in the case, was thus called upon to give an opinion upon his memory of what the evidence was, and upon his conclusions as to what the evidence established as facts, thus being called upon to determine the facts for himself, thereby becoming the trier of the facts in place of the jury. There is much force in this contention. It has, however, been held that even where more than one witness has testified, if there is no conflict in the evidence, as in the case at bar, a court may, in its discretion, allow counsel to ask a hypothetical question upon the facts testified to by the witness as he remembers them without any recapitulation of the evidence. [Rogers on Expert Testimony (2 Ed.), 71.]

But the better practice in all cases where the facts are controverted or are not entirely clear, is to put to the expert hypothetical questions, based upon the facts claimed to have been proven by the evidence in order that the jury may know the facts and circumstances upon which the expert's opinion may be based, and, to determine for themselves, as is their province, whether proven or not; otherwise, the expert must depend upon his memory as to the facts and predicate his opinion thereon, thus becoming himself the trier of the facts, instead of the jury.

In Bennett v. The State, 57 Wis. 69, it was said: ''To permit an expert in such case to give an opinion upon his memory of what the evidence was, and upon his conclusions as to what the evidence established as facts, would seem to be trenching upon the province of the jury and trying the case solely upon the opinions of the experts, founded upon their recollection and their

opinion as to what the facts proved were. It does not help the case to say that the question is qualified by the statement made therein, 'taking the testimony as true,' because the expert must still trust to his memory of what the evidence was; and his inferences, deduced from facts sworn to by the witnesses, will necessarily control his judgment as to what in fact was the evidence in the case, and he will make up his mind from his understanding of what was sworn to by the witnesses. He may understand the evidence to be radically different from what the jurors or other persons hearing the testimony understand it. It is almost impossible that all the testimony given in such case, coming from many witnesses and elicited by a long examination, should be entirely uncontradictory, or should be so plain that different inferences would not be drawn by different men. And to permit an expert to give his opinion, which is to go to the jury as competent evidence, upon such a mass of testimony, without any explanation as to what state of facts such opinion is based upon, is in effect taking the case from the jury and deciding it upon the understanding of the witnesses as to what facts the evidence in the case established. We think the better rule is that the jury shall be clearly informed of the exact state of facts upon which the expert bases his opinion, and they certainly are not so informed when he gives his opinion upon his recollection and understanding of the whole evidence in the case. and this is especially so where the evidence is voluminous, is elicited from a large number of witnesses, and is not entirely harmonious and uncontradictory. The jury should in every case distinctly understand what are the exact facts upon which the expert bases his opinion. This is, perhaps, best accomplished by limiting him to answering hypothetical questions, and if it be proper in any case to permit an expert who has heard the testimony of a particular witness or of all the witnesses to give his opinion upon such evidence, and there be any

conflict of evidence, or any doubt as to what the evidence is, he should be required to state fully his understanding as to what facts are established by such testimony. In such case the jury will be able to determine whether his opinion is based upon the evidence in the case as they understand it, or otherwise. Any other rule, it seems to us, leaves the jury entirely in the dark as to the most important fact, viz., whether the opinion is based upon the evidence as they understand it, or upon some other construction of the evidence not in their opinion justified by the testimony in the case.''

The same rule is announced in 2 Greenleaf on Evidence (7 Ed.), sec. 373, note 1; Guiterman v. Steamship Co., 83 N. Y. 358; Reynolds v. Robinson, 64 N. Y. 589; Dexter v. Hall, 15 Wall. 9; McMechen v. McMechen, 17 W. Va. 683, 694; State v. Felter, 25 Iowa 67; Reed v. State, 62 Miss. 405; State v. Bowman, 78 N. C. 509; Rogers on Expert Testimony, p. 64, sec. 27, note 1.

Over the objection of defendant the State was permitted to read in evidence a deed of trust executed by defendant and wife on the 30th day of November, 1901, to secure the payment of a note for that sum executed by him on that day to John W. Clapp, one of defendant's attorneys, and this is claimed by defendant to be reversible error. The homicide was committed on the 26th day of November, 1901, and we are inclined to the opinion that the deed of trust having been executed so recently thereafter, it was admissible as tending to show that he was not insane at the time of the homicidal act. It is true that it could have had but little weight with the jury even upon that question, but that was for their consideration.

It is said that the first instruction given on the part of the State is erroneous in that it eliminates from the consideration of the jury the question of whether under the evidence the defendant could be guilty of a less grade of homicide than murder in the first degree. We

are unable to agree to this contention. There was every element of murder in the first degree in the homicide. The evidence shows that the killing was done feloniously, willfully, deliberately, with premeditation, on purpose, and with malice aforethought, thus supplying every ingredient necessary in murder in the first degree, of which he was clearly guilty unless excusable upon the ground of insanity. There was nothing whatever, not a single circumstance, to reduce the offense to a less grade of offense. The case of the State v. Grugin, 147 Mo. 39, is not an authority for such contention.

In that case the defendant shot and killed the deceased as soon as he could get to him after learning that he had wronged his daughter, and the deceased said to him that he would do it again and started towards him as if to assault him. In the case at bar, the defendant waited for weeks after he had learned of the intimacy of deceased with his wife, after they had entered into an armistice and deceased had been assured by defendant that he need not fear harm from him, that, too, without a word of any kind from deceased. There was, therefore, no error in giving this instruction.

The fifth instruction given on the part of the State is criticised upon the ground that it embraces abstract propositions of law, tells the jury under what circumstances a man would be guilty of murder in the second degree or manslaughter for killing another guilty of adultery with his wife, when there were no such issues in the case.

That this instruction presented mere abstract propositions of law to the jury and had no place in the case is indisputable; but it does not necessarily follow that it was prejudicial error. The court had already instructed that under the evidence defendant was either guilty of murder in the first degree or not guilty of any offense, which was manifestly correct under the evidence. It could not, therefore, in any possible way have

detracted from the weight of the evidence adduced in support of the plea of insanity, or made stronger the State's case, for there could be under the facts and the law as declared by the court but one of two results, that is, a conviction of murder in the first degree, or an acquittal upon the ground of insanity. There was no probability that the jury were misled, or that they could in fact have been misled by the instruction, although it merely embodied abstract propositions of law.

It was held by this court in State v. Dunn, 80 Mo. 681, that a defendant can not complain of an instruction as to a grade of offense of which he was not convicted, even though the instruction was erroneous, and we are unable to see any material difference between such an instruction and the one under consideration, which correctly told the jury what the law is under circumstances therein set forth, though not authorized, for the want of evidence upon which to base it. The judgment should not be reversed upon this ground.

There was no error in refusing to permit the witnesses, Hammond, Page, May and Knowles to testify that the deceased had gone armed in the expectation of meeting the defendant, and that the deceased had said that he might use weapons which he carried, on the person of the defendant. Threats of this character are only admissible when the plea of self-defense is interposed, and there is no pretense that the shooting in this case was done in self-defense. [State v. Reed, 137 Mo. 137; State v. Clum, 90 Mo. 482; State v. Brown, 63 Mo. 439.]

The crime was a most atrocious one, rarely equaled in its brutality among civilized people. After defendant learned that his wife and deceased had been criminally intimate for years, he notified him to leave the country, which he did as soon as possible, and went to Oklahoma with the view of moving there with his family and making it their future home. But after he had been gone but a few days defendant learned from his

wife that she had also been criminally intimate with another man.    Whereupon defendant said that he "could not kill all the people in the neighborhood." He then saw the wife of the deceased, and requested her to send word to her husband that he might return home, and defendant gave Mrs. Wolf his word of honor that no harm should come to her husband.    With this assurance communicated by Mrs. Wolf to her husband he returned home, and thereafter while deceased, his wife, and two young sons were enroute with their wagon to market they passed along the road in proximity to where defendant and others were engaged in digging a well, one of whom was his son.    Defendant inquired of his son if that was Wolf in the wagon, and being informed that it was, went some distance, procured a double-barrel shotgun, mounted a horse, followed deceased about three-fourths of a mile, halted them, and fired one load of shot into the back of deceased.    Whereupon deceased managed to get out or fell out of the wagon, and was by the side of his horses, and while his wife was begging and screaming in the presence of her two little boys not to kill her husband, that she could not support her little family, he, in utter disregard of her pleadings or of the presence of her and her children, fired the remaining load of shot into the head of deceased, blowing off the whole front part of it, killing him instantly, without any effort upon the part of deceased to defend himself.    It would be hard to find a more deliberate murder, or one more cruel and inhuman.

Finding no reversible error in the record, we can but affirm the judgment, and direct the sentence which the law imposes to be executed.    All concur.