HOOPER W. WARREN, Administrator of the Estate
of WILLIAM T. WELCH, deceased (Plaintiff In-
terpleader-, Appellant, v. ÆTNA LIFE INSUR-
ANCE COMPANY OF HARTFORD, CONNECTI-
CUT, a Corporation, Defendant, and JAMES P.
NEWELL, Public Administrator of the City of St.
Louis, in charge of the Estate of EDITH WELCH,
deceased (Defendant Interpleader), Respondent.

St. Louis Court of Appeals. Opinion Filed June 3, 1919.

INSURANCE: Accident Insurance: Death of Husband and Wife: Cap-
sizing of Boat: Survivor: Interpleader: Evidence. In an action by
deceased husband's administrator on the' husband's accident insur-
ance policy, which provided for payment upon the husband's death
to his wife, if living, otherwise to the executors, administrator or
assigns of the insured, where the death of both husband and wife
by being drowned was caused by the capsizing of a boat in a
storm or cyclone, *held*, according to a preponderance of the tes-
timony and reasonable inferences to be drawn therefrom, the wife
survived her husband, and her administrator (interpleader) was
entitled to the fund.

(1)

1—Mo. App.

Appeal from the Circuit Court of the City of St. Louis.—
*Hon. George H. Shields,* Judge.

AFFIRMED.

*Henry S. Caulfield* for appellant.

(1) The facts in evidence do not sustain the trial court's finding that the named beneficiary survived the insured. (2) The burden was on the defendant interpleader, administrator of the named beneficiary, to prove that the beneficiary survived the insured, and having failed in that proof he cannot recover, and the proceeds of the policy should go to the administrator of the insured, plaintiff interpleader, unless the named beneficiary had a vested interest in the policy. Supreme Council v. Kacer, 96 Mo. App. 93; Unted States Casualty Co. v. Kacer, 169 Mo. 301; Aley v. Railroad, 211 Mo. 480. (3) The beneficiary did not have a vested interest in the policy, because the policy permitted the insured to displace his wife as the payee of the policy in favor of someone else. Supreme Council v. Kacer, 96 Mo. App. 93; May on Insurance (4 Ed.), sec. 399 M; 4 Cooley's Briefs on Insurance, p. 3755; Kerr on Insurance, p. 690; Vance on Insurance, p. 399; 25 Cyc. 893; Mut. Ben. Life Ins. Co. v. Swett, 22 Fed. 204; N. Y. Life Ins. Co. v. Daley, 25 Calif. App. 378; Atl. Mut. Life Ins. Co. v. Gannon, 179 Mass. 294; McEwen v. N. Y. Life Ins. Co., 23 Calif. App. 699; Townsend v. Fid. Cas. Co. (Ia.), 144 N. W. 576; Denver Life Ins. Co. v. Crane, 19 Colo. App. 199; Cavagnaro v. Thompson, 138 N. Y. Supp. 820; Wrather v. Stacy (Ky.), 82 S. W. 420; McNiel v. Chinn (Tex. Civ. App.), 101 S. W. 467. (4) Our statute (R. S. 1909, sec. 6944) does not affect the rule, that the reservation to the insured of a right to displace the named beneficiary prevents the interest of the beneficiary from being vested. Eves v. Woodmen of the World, 153 Mo. App.

247;   Robinson v. Insurance Company, 168 Mo. App. 259.

*Campbell Cummings* for respondent.

(1) A special finding of facts by the trial judge in an equity case may be adopted by the Appellate Court as a fair and substantial statement of facts shown by the trial and his written opinion may be of much service to the examination and adjudication of the case. U. S. Cas. Co. v. Kacer, 169 Mo. 301, 307, 309.   (2) There is no presumption of survivorship when several persons perish in a common accident, as the law discards the intricate presumptions based on age, health, sex, etc.   U. S. Cas. Co. v. Kacer, 169 Mo. 301, 311; Supreme Council v. Kacer, 96 Mo. App. 93, 110.   (3) The facts in evidence clearly and satisfactorily sustain the trial judge's finding that the named beneficiary survived the insured. In fact, no other conclusion could have been reached under the evidence and such finding was independent of any question of law.   See written opinion appendix respondent's brief.   (4) Neither the insured alone nor the insured and the company acting together will be permitted to change the beneficiary in the policy where a privilege of arbitrary change or at will is not expressly reserved or expressly authorized therein.   Their rights are necessarily subject to the terms of the contract, since such rights depend upon the contract and the vested right of the beneficiary is subject to be divested only in accordance with the express provisions of the contract.   Leeker v. Ins. Co., 154 Mo. App. 440, 451 (adopted by St. L. Ct. of Appeals, 163 Mo. 523;   Sov. Camp W. O. W. v Downing, 201 S. W. 952, secs. 5, 6;   Protective League Life v. Downing, 202 S. W. 290; Eves v. Woodmen, 153 Mo. App. 247, 257; Packard v. Conn. Mut. L. Ins. Co., 9 Mo. App. 469, 476; Coleman v. N. W. Mut. L. Ins. Co., 273 Mo. 620, 626, 628; Lloyd v. Royal N. M. L. I. Co., 245 Fed. 162, 165, 168; Deal v. Deal, 87 So. Car. 395, 398, Ann Cas. 1912B. 1142, 1143; Condon v. N. Y. L. Ins. Co., 166 N. W. 452, 454;

Met. Life I. Co. v. O'Donnell, 102 Atl. 163, 165; Begley v. Miller, 137 Ill. App. 278, 280, 281; Ind. M. L. Ins. Co. v. McGinnis, 180 Ind. 9, 10, 18, 22, 25; Neary v. Met. L. I. Co., 103 Atl. 661, 662; Kline v. Nat'l Ben. Ass'n, 111 Ind. 462, 465; 14 R. C. L., p. 1376, sec. 545. (5) The clause in the policy in respect to change of beneficiary is as broad as its terms and no broader, and hence it must be construed according to the terms and stipulations expressing it in a given case and the power to exercise it is measured by the language on which it is founded. McKinney v. Ins. Co., 270 Mo. 305, 315; U. S. Cas. Co. v. Kacer, 169 Mo. 301, 315; Deal v. Deal, 87 S. Car. 395, 400, 401; Rumsey v. N. Y. L. I. Co., 147 Pac. 337; Chance v. Simpkins, 91 S. E. 773, 774. (6) In order to effect a change of the beneficiary under a provision therefor in an old-line policy, the trend of the recent cases uphold the rule that the requirements of the policy in this respect must be complied with, even where there is an express reservation of divestiture.   Deal .v. Deal, 87 So. Cas. 395, 400, 401; Neary v. Met. L. Ins. Co., 103 Atl. 661, 662; Begley v. Miller, 137 Ill. App. 278; Ind. L. Ins. Co. v. McGinniss, 180 Ind. 9, 21, 22, 24; Chance v. Simpkins, 91 S. E. 773, 774; Townsend v. Townsend, 127 Ky. 230, 316; Met. Ins. Co. v. Clanton, 76 N. J. Eq. 4; Mueller v. Penn. M. L. I. Co., 161 Pac. 148, 150; Sullivan v. Maroney, 76 N. J. Eq. 104, 110; Washington L. Ins. Co. v. Berwald, 97 Tex. 111, 116; Sheppard v. Crowley, 61 Fla. 735, 740; Filley v. Ill. L. Ins. Co., 93 Kan. 193, 197; Lloyd v. Royal N. M. L. I. Co., 245 Fed. 162, 165, 168; Perry v. Tweedy, 128 Ga. 402, 405; Thomas v. Thomas, 131 N. Y. 205; O'Donnell v. Met. L. Ins. Co., 95 Atl. (Del. Ch.) 289; Met. L. Ins. Co. v. O'Donnell, 102 Atl. 163, 165 (S. C.); Leeker v. Ins. Co., 154 Mo. App. 440, 451; Christman v. Christman, 163 Wisc. 433; Mut. Ben. L. Ins. Co. v. Swett, 222 Fed. 200, 205; Ann. Cas. 1912-B, p. 1145,

2nd. Col., last par.; Arnold v. Empire Ins. Co., 3 Ga. App. 685; Smith v. Head, 75 Ga. 755, 757; Holder v. Prud. Ins. Co., 77 S. C. 299; Urick v. W. Tr. Ac. Ass'n, 81 Neb. 327; French v. Prov. S. L. A. Ass'n, 205 Mass. 424, 427, 428; Freund v. Freund, 218 Ill. 189, 195, 199 (reversing 117 Ill. App. 565). (7) The naming of a beneficiary in an old-line policy is a part of the contract, and the vested interest of the named beneficiary cannot be divested except by a strict compliance with the stipulations of the policy, even where a change by the insured was actually attempted, and an interpleader suit by the company after the death of the insured is not a waiver in such policies. Chance v. Simpkins, 146 Ga. 519, 91 S. E. 773, 774; Filley v. Ill. L. Ins. Co., 93 Kan. 193, 196, 197; Johnson v. N. Y. L. Ins. Co., 138 P. 414, 416; Lloyd v. Royal N. M. L. I. Co., 245 Fed. 162, 165, 168; Neary v. Met. L. Ins. Co., 103 Atl. 661, 662; Muller v. Penn. M. L. I. Co., 161 Pac. 148, 150; City Nat'l Bk. v. Lewis, 176 Pac. 237; Deal v. Deal, 87 S. Car. 395, 400; Rumsey v. N. Y. L. I. Co., 147 Pac. 337; Met. L. I. Co. v. O'Donnell, 102 Atl. 163, 165; Met. Ins. Co. v. Clanton, 76 N. J. Eg. 4, 7. (8) Even where an express permission to change beneficiary is given in ordinary policy, such a change in beneficiaries is not completed until its indorsement by the company on the policy. An insurance policy, like any other written instrument, is to be considered as a whole. The parts concerning the change of beneficiary must be likewise then considered. That portion which provides that no change shall take effect unless endorsed on the policy by the company at the home office is entitled to the same consideration as any other portion pertaining to such change. Rumsey v. N. Y. L. I. Co., 147 Pac. 337; Met. L. Ins. Co. v. O'Donnell, 102 Atl. 163, 165; Neary v. Met. L. Ins. Co., 103 Atl. 661, 662. (9) The law favors vested estates and no remainder will be construed as contingent which may, consistently with the intention, be deemed vested. Byrne v. France, 131 Mo. 639. (10)

When the beneficiary has a vested interest in the policy, the burden of proof of survivorship is on the administrator of the insured, and the rights of the beneficiary being vested, they could not be divested prior to the innovation of inserting in such policy a contract provision which entitled the insured to change the beneficiary. U. S. Cas. Co. v. Kacer, 169 Mo. 301, 309-310, 313-315; Blum v. N. Y. L. Ins. Co., 197 Mo. 513, 522-523; McKinney v. Ins. Co., 270 Mo. 305, 315; Grisby v. Russell, 222 U. S. 149; Mas. Ben. Ass'n v. Bunch, 109 Mo. 560, 579-580; Wells v. Mut. Ben. Ass'n, 126 Mo. 630. (11) We submit, that it is still an open question in this State whether or not section 6944, R. S. 1909, does or does not give the beneficiary, the wife, a vested interest in old line insurance policies when it is considered that section 5854, R. S. 1889, was repealed and a new section enacted in lieu thereof in section 7895, R. S. 1899 (Laws of 1899, p. 246). Sec. 5854, R. S. 1889; Sec. 7895, R. S. 1899; Sec 6944, R. S. 1909; McKinney v. Ins. Co., 270 Mo. 305, 316 (Sec. 6944, R. S. 1909); Clarkston v. Met. L. Ins. Co., 190 Mo. App. 624, 631 (Sec. 6944, R. S. 1909); Orthwein v. Germania Life Ins. Co., 261 Mo. 650, 667, 669, 673 (Sec. 6044, R. S. 1909); Haven v. Ins. Co., 149 Mo. App. 291; 294, 299 (Sec. 7895, R. S. 1899); Eves v. Woodmen, 153 Mo. App. 247, 254-58 (Sec. 5854, R. S. 1889); Robinson v. N. Y. Life Ins. Co., 168 Mo. App. 259 (Sec. 5854, R. S. 1889); Smith v. Gr. L. A. O. U. W., 124 Mo. App. 181, 200 (Sec. 7895, R. S. 1889); Blum v. N. Y. L. Ins. Co., 197 Mo. 513, 522, 523, 527-529 (Sec. 7895, R. S. 1899); Olmstead v. Ben. Soc., 37 Kan. 93; Nat'l L. Ins. Co. v. Brautigan, 154 N. W. (Wis.), 839, 840; 163 Wis. 270, 271, 273; Grems v. Traver, 148 N. Y. S. 200, 203-206 (149 N. Y. S. 1085); Christman v. Christman, 163 Wis. 433, 434; O'Donnell v. Met. L. Ins. Co., 95 Atl. 289 (Del. Ch.); Met. Life Ins. Co. v. O'Donnell, 102 Atl. 163;

Freund v. Freund, 218 Ill. 189, 195, 198, reversing 117 Ill. App. 565; Cornell v. Ins. Co., 179 Mo. App. 420, 429 (Sec. 6944, R. S. 1909); Diehm v. Ins. Co., 129 Mo. App. 256, 262 (Sec. 4600, R. S. 1899, now Sec. 2878, R. S. 1909, and Sec. 4613, R. S. 1899, now Sec. 546, R. S. 1909); Urick v. Trav. Acc. Ass'n, 81 Neb. 327.

BECKER, J.—This action originated as a suit brought by the plaintiff, Hooper W. Warren, administrator of the estate of William T. Welch, deceased, against the Aetna Life Insurance Company of Hartford, Connecticut, a corporation, upon an accident policy, to recover the proceeds thereof amounting to $4018.14. The insurance company filed an answer in the nature of a bill of interpleader, which was sustained, and the said company, upon paying said fund into court, was discharged and the said plaintiff as administrator aforesaid, and James P. Newell, public administrator in charge of the estate of Edith Welch, deceased, were ordered to and did interplead for said fund. A trial was had before the court without a jury, resulting in a decree that Newell, public administrator, was entitled to the fund. In due course Warren, as administrator, brings this appeal.

By a stipulation of the parties duly filed of record it was agreed that William T. Welch, the insured, and Edith Welch, were husband and wife, and that both were drowned on August 19, 1913, as the direct and immediate result of the overturning of the government boat, Henry Bosse, in the Mississippi river near Keokuk, Iowa. At the time said Welch was drowned he was insured against accident, for the proceeds of which policy of insurance the parties herein are interpleading; that the said policy of insurance contained the following provisions:

"The principal sum payable for loss of life shall be paid to the beneficiary named in the schedule of warranties endorsed hereon, if living, otherwise to the

executors, administrators or assigns of the insured"

"A. The company may cancel this policy by notice of cancellation mailed to the insured's residence address as given in the schedule of warranties endorsed hereon, or served upon the insured by a representative of the company, with a check of the company or of its duly authorized agent, or cash, for the unearned part, if any, of the premium. The insured may likewise cancel by surrender of the policy and the latest renewal receipt, if any, to the company, or its duly authorized agent, the unearned portion of the premium actually paid therefor, less customary short rates for the time in force, being thereupon payable on demand.

"B. The consent of the beneficiary shall not be requisite to a surrender or assignment of this policy, nor to a change of beneficiary hereunder."

The schedule of warranties contained the following paragraph:

"9. Policy to be payable in case of death under its provisions to: Name, Edith Welch; address, St. Louis, Relationship to me of beneficiary is that of wife."

Warren, administrator, plaintiff interpleader, introduced the policy and the above mentioned stipulation in evidence and rested. Newell, administrator, the defendant interpleader, thereupon without objection assumed the burden of proving that the beneficiary, Edith Welch, survived her husband.

All the evidence adduced on behalf of Newell, administrator, was in the form of depositions, being the testimony of Helmer Swenholt, a United States Inspector assigned to the steamboat, Henry Bosse, and who was aboard her on the day of her overturning; the testimony of Glen Slee, whose occupation was mate and steersman on the said steamboat on the day in question; and Dirk LaFever and Joseph Fitzpatrick, both residents of Keokuk, Iowa, who went out to the hull of the Henry Bosse after the boat had capsized, and were

present the day after when the body of Welch was recovered from the wreck.

According to the undisputed testimony, Welch was the cook and his wife waitress on the steamboat, Bosse. The boat was twenty-two feet wide and one hundred and twenty-six feet long. The main deck was eighteen inches above the water; the engine room and boilers, as well as the galley or kitchen were situated on the main deck; the boiler room being forward, with the galley in the stern half of the boat and just in front of the engine room. The cabin and sleeping quarters were on the upper deck, referred to as the boiler deck inasmuch as the deck was immediately above the boilers and engine room. The cabin was about eighteen feet wide, the forepart being used as a dining room, back of which were the staterooms or sleeping quarters. On the starboard side were two staterooms and on the portside there were three staterooms and a small office, and there were also two more staterooms at the rear of the cabin; a gangway or hall six feet wide ran between the port and starboard cabins; Welch's stateroom was the second stateroom from the bow on the starboard side. This stateroom was about seven feet fore and aft and six feet across deck.

The boat had no guardrail of any kind on its main deck, and the main deck had an overhand of some two feet over the sides of the hull. On the upper, or boiler deck, there was a guardrail two and one-half feet high which was about two feet distant from the outer doors of the cabins.

Welch's position as cook required him to be up very early in the mornings, so that it was his habit to take a nap each afternoon, going to bed about two o'clock and sleeping until four o'clock. On this particular afternoon Mrs. Welch was seen sitting in front of the kitchen at three or three twenty P. M.

On the afternoon of August 19, 1913, between three twenty and three thirty o'clock the steamer, Bosse, was on the Mississippi river near Keokuk, Iowa. A severe

storm or cyclone came up. The boat was headed about one degree northwest when the storm struck her starboard side and turned the boat over completely so that the bottom of the hull of the boat was on top and about eighteen inches above the water.

The Bosse had inch and a quarter hog chain braces running lengthwise of the boat from bow to stern. The object of these hog chains were to hold up the bow and stern of the boat, and to brace the superstructure of the boat. These hog chains, two in number, ran up through the aft part and the front part of the cabin and were supported by two eight by eights forward and aft, and by two eight by eight braces on each side of the cylinder timbers. Each of these ·braces had an iron plate with a groove in it on the top, and the hog chain rested in said groove. These hog chains ran over each end of the boat from the hull up through the cabin and came out over the roof of the top of the braces. After the boat capsized she rested on the main hog chain braces and the boat was held up in such a way that the hull was out of the water a foot and a half or two feet.

According to the deposition of Swenholt, read on behalf of defendant interpleader, the witness, at the time the storm struck the Bosse, was going down from the boiler deck to the main deck and when about half way down the stairs the wind caused the boat to turn over on its side, and the witness hurried down the balance of the stairs and endeavored to climb up to the high side of the hull of the boat at a point forward, on the forecastle or bow. The witness not being able to get to the high side of the boat, grabbed hold of one of the uprights which held up the forepart of the boiler deck, "after the boat got over, I expect to an angle of thirty degrees—thirty to forty-five degrees—the cabin collapsed and I fell into the water. The hull settled over me and I swam from under it and crawled on top of the hull." He stated that about one minute had elapsed from the time the cabin struck the water and the time the witness climbed up on the top of the upturned hull of the

boat; that in the opinion of the witness the boat was then probably resting upon the hog chain braces and part of the cabin; that when the witness climbed on to the hull, Slee, Henderson and Guthrie, three men working on the boat, were already upon the upturned hull. In his deposition the following questions and answers appear: "When you got on the hull, state whether or not you saw Mrs. Welch? A. I did. Q. Where was she? A. About thirty feet from the hull of the boat, toward the Illinois side of the river. Q. Was she alive? A. She was."

On cross-examination he stated that when he saw Mrs. Welch, after the boat had capsized, she was about thirty feet toward the Illinois side of the river and probably about ten feet farther up stream; that she was facing about halft way toward the boat and half way down the river, and that he could see her from her shoulders up; that her arms were over her head, and that he only saw Mrs. Welch for a few seconds, and that she went down after that. He again stated that from the time the wind struck the boat, causing her to turn over, until he was on top of the hull, not more than one and one-half minutes had elapsed, and to the last question put to him on "re-re-re-cross-examination," namely, "And yet you attempt to say that Mrs. Welch was alive when you saw her under such circumstances only for three or four seconds?" He answered: "Yes, sir."

The deposition of Glen Slee was read on behalf of defendant interpleader. Slee was mate and steersman on the Bosse at the time the boat capsized and as the storm came up he had gone into the coal bunkers in front of the boilers to get in out of the rain. When the wind hit the boat it started to turn over and Slee attempted to climb to the starboard side and get on top of the coal bunkers. When the boat careened the boilers broke loose and rolled off into the river and the boat turned over completely, and Slee climbed over and on top of the upturned hull. According to Slee's deposition, after the boat turned over it took his about one-half

minute to climb on to the hull of the boat. The witness, after he got on to the hull of the boat, saw Mrs. Welch come up about twenty-five or thirty feet from the hull of the boat and toward the Illinois shore; that about one and one-half minutes had elapsed from the time the boat upset until he saw Mrs. Welch. He was asked the question: "Was she alive," to which he answered: "She was;" and according to his testimony Swenholt and Guthrie, men who were working on the boat at the time, were on top of the hull near him; that Swenholt said: "For God's sake, save Mrs. Welch." The witness said he remenbered this because Guthrie stated he could not "swim a lick;" that at the time Swenholt made this remark Mrs. Welch was in their sight.

On cross-examination Slee stated that Mrs. Welch was facing down stream and probably thirty feet from the hull at the time he saw her; that Mrs. Welch was about opposite the place he was on the hull of the boat; that at the time the water was rough, the waves running two or three feet high; that the water was about thirteen feet deep where the boat was overturrned, and that the boat rested on the hog chain braces and the hull was a few feet out of the water; that at the time a heavy rain was falling and the wind was blowing hard. When asked what there was about the appearance of Mrs. Welch when he saw her come up, after the boat had overturned, that made him believe she was alive, the witness answered: "It seems to me as though she moved her hands and I did not think she would have come up if she was not alive—drowned people do not come up so soon."

The depositions of Dirk LaFever and Joseph Fitzpatrick were read on behalf of defendant interpleader. They were present at the time Welch's body was recovered from underneath the boat, which was the day after the boat had capsized. A government boat with a dipper had drawn up along side the Bosse toward the Illinois shore and the dipper run down underneath the Bosse and used to bring up wreckage;   that the

dipper was working at the point "toward the bow end, about the center," when the body of Welch came to the surface, his head coming up first, his arms folded across his chest, the body being clothed only in a suit of underwear; that the body came up with a lot of wreckage; that upon the presence of Welch's body being noticed the dipper was stopped and LaFever tied a rope around and drew the body to the boat.

The plaintiff interpleader introduced Jesse Siefert as a witness. He testified that he was the pilot and acting master in charge of the Bosse at the time in question; that when the storm struck the boat he was in the pilot house and that "when the boat had careened to an angle of forty-five degrees, her boilers slipped off and the bow lightened up and she swung around, and the cabin kept reversing and going about and the hull turned turtle, bottom side up," and it took perhaps one and one-half minutes for the boat to completely capsize; that when the boat turned over so that the pilot house was in the water he clambered out and was carried down stream by the current and landed on the river bank about one thousand yards away; that he was present when they removed the body of Welch; that the arms were crossed over the lower part of his chest; that he knew of his own knowledge that Welch was in the habit of sleeping with his arms folded across his chest in that manner: "Welch generally sleeps that way when he is asleep in his bed. I have seen him lying there, and as a general rule he always would lay in bed that way, and he was found on the mattress about the same as he sleeps in bed whenever I saw him."

We are of the opinion that men of ordinary reason and fairness, in light of the facts as they appear in this record, would come to the conclusion that Edith Welch, had survived her husband, and such is our view and judgment in the matter after a careful consideration of the testimony herein. It is true that two persons, when exposed to the same peril, as when two people are killed in one catastrophe, such as a train or automo-

bile collision or wreck, or the sudden capsizing of a boat, or an explosion of a powder plant, or by a stroke of lightning, may, under the facts shown, be held in law to have died at the same moment, and whilst it may be unbecoming for a judicial tribunal "to speculate or guess whether, during the momentary life struggle, one or the other may have ceased to gasp first," yet in our view this record presents no such case. Here we have the testimony of three living witnesses to the facts and circumstances of this unfortunate happenings. All three agree on the essential facts of the actual occurrance itself, and two of such witnesses testify that they saw the wife, after the boat had completely capsized, rise to the surface of the river with her hands above her head, which to them seemed to be moving and that she, in their opinion, was alive at that time, when according to the uncontradicted testimony, the body of the husband was underneath the upturned boat and beneath the surface of the water. In our judgment it is fitting and proper that the court assume the responsibility of holding that under the facts and circumstances in this case, as presented by the record, the wife did in point of fact survive the husband.

It is a fair presumption that Welch was sleeping, or at least lying down in his cabin at the time the boat was overturned. According to one of the witnesses the boat turned over so rapidly that the witness was unable to clamber up to the high side of the boat in time to avoid the hull falling over him, requiring him to swim from underneath it. With this must be considered the fact that Welch's body came to the surface with wreckage that came from the cabin from underneath the upturned boat, and that his body came up head first with the arms folded across the lower part of his chest, which according to the only witness for the plaintiff, was the usual and customary position assumed by Welch when sleeping. Yet after the boat had capsized and two of the witnesses had had time to swim from underneath the hull and climb on top thereof, Mrs. Welch

was seen to come to the surface of the water and she rose high enough in the river so that all her body from beneath the arms was visible, and with her hands above her head, and according to one witness her hands appeared to be moving. It would, in our opinion, be lame justice indeed which would attempt to side step the responsibility of desciding that, according to the evidence in this case, Edith Welch had survived her husband, William T. Welch. We conclude, and so hold, that she did so survive her husband, according to a preponderance of the testimony and reasonable inferences to be drawn therefrom.

Finding as we do that the wife survived her husband, the legal propositions presented by the appellant, plaintiff interpleader, need not be passed upon. In light of what we have stated the judgment of the trial court awarding the fund to the administrator in charge of the estate of Edith Welch, deceased, should be and the same is hereby affirmed.

*Reynolds, P. J.*, and *Allen J.*, concur.