The PRUDENTIAL INSURANCE COM-
PANY OF AMERICA, Plaintiff,

v.

Joy R. SUTTON, Administrator of
the Estate of Velma Webster,
Defendant-Respondent,

and

Robert V. Babb, Administrator of the
Estate of Wayne R. Webster,
Defendant-Appellant.

No. 31194.

St. Louis Court of Appeals.

Missouri.

May 21, 1963.

Lashly, Lashly & Miller, Paul R. Moody, St. Louis, for plaintiff.

Flynn, Challis & Sumner, Thomas W. Challis, Jr., St. Louis, for defendant-appellant.

Harry Gershenson, St. Louis, for defendant-respondent.

DOERNER, Commissioner.

This appeal is from a judgment and decree rendered in an interpleader action in which the individual Administrators of a husband and wife, both of whom died as the result of a common disaster, each claimed the proceeds of a life insurance policy in which the husband was the insured and the wife was named the beneficiary. The Circuit Court of the City of St. Louis held that the wife had survived her husband and directed the payment of the fund to the Administrator of her estate. In due course the Administrator of the husband's estate appealed.

On or about April 21, 1958, the Prudential Insurance Company of America issued its policy numbered M90 287 371 on the life of Wayne R. Webster in the face amount of $1000, with a like sum payable in the event of accidental death. Mrs. Mathilda E. Webster, mother of Wayne R. Webster, was the named beneficiary, but on June 12, 1959 the named beneficiary was changed to Velma Haus, friend. Shortly thereafter, on July 4, 1959, Mr. Webster and Mrs. Haus were married. Two weeks later, on July 18, 1959, they came to their death as the result of a head-on collision between the automobile in which they were passengers and another car, on U. S. Highway 61 near Engle Creek Road in Jefferson County. Joy R. Sutton, Administrator of Mrs. Webster's estate, claimed that Mrs. Webster had survived her husband and made a demand on The Prudential for the proceeds of the policy. Robert V. Babb, Administrator of Mr. Webster's estate, disputed the survivorship of Mrs. Webster and likewise demanded the proceeds. The Prudential then instituted the interpleader action naming each Administrator as a party defendant. The chancellor heard the evidence and, as stated, entered a judgment and decree in favor of the Administrator of Mrs. Webster's estate.

■ Prior to a consideration of this case on its merits we must first dispose of respondent's motion to dismiss this appeal. Respondent alleges therein that appellant's brief fails to comply with Civil Rule 83.05, V.A.M.R. in that it does not contain a fair and concise statement of the facts. Respondent contents himself with that assertion without pointing out in his motion the material evidence which he claims was omitted. An examination of the statement and a reading of the relatively short transcript discloses that while the statement is not as comprehensive as it might have been, it is not so fatally deficient as to require dismissal of the appeal. Respondent's motion should therefore be overruled.

Section 471.040, RSMo 1959, V.A.M.S., as amended, of our Uniform Simultaneous Death Act provides:

"Where the insured and the beneficiary in a policy of life or accident insurance have died and there is no sufficient evidence that they have died otherwise than simultaneously the proceeds of the policy shall be distributed as if the insured had survived the beneficiary."

Prior to the passage of our Simultaneous Death Act in 1947, Missouri, together with all jurisdictions that proceeded according to the common law, did not indulge in any presumption of survivorship in case of a common calamity where title to property or the descent thereof was involved. United States Casualty Co. v. Kacer, 169 Mo. 301, 69 S.W. 370, 58 L.R.A. 436; Abrams v. Unknown Heirs of Rice, 317 Mo. 216, 295 S.W. 83, 85. The rule followed was that he who claimed a right by virtue of survivorship had the burden of proving the fact of the survival of him through whom he claimed; and that, failing in this, the property or fund remained vested as it was before the calamity. Stewart v. Russell, Mo., 227 S.W.2d 1011; United States Casualty Co. v. Kacer, supra. Thus as to title to property or the devolution thereof, Section 471.010 of the Simultaneous Death Act created no new presumption as to survivorship. Schmitt v. Pierce, Mo., 344 S.W.2d 120.

In the matter of life insurance, however, a different rule existed prior to the enactment of our Simultaneous Death Act. In such a case the question of whether the burden of proof as to survivorship was cast on the personal representative of the insured, or that of the beneficiary, depended upon whether the insured had reserved the right to change the beneficiary. If the insured had not, it was held that the beneficiary had a vested interest, subject to being divested only if the beneficiary died before the insured, and that the burden of proving that the insured survived the beneficiary was cast on the former's personal representative. United States Casualty Co. v. Kacer, 169 Mo. 301, 69 S.W. 370, 58 L.R.A. 436, 92 Am.St.Rep. 641. On the other hand, if the right to change the beneficiary had been reserved by the insured, then it was said that the beneficiary had no vested interest and in order to recover it was incumbent upon his personal representative to prove that the beneficiary had survived the insured. Supreme Council of Royal Arcanum v. Kacer, 96 Mo.App. 93, 69 S.W. 671. In the instant case the insurance policy was not introduced in evidence, but the fact that Mr. Webster substituted Mrs. Webster (then Mrs. Haus) as beneficiary in place of his mother would indicate that he had reserved the right to change the beneficiary. And in any event, Section 471.040 clearly provides that where the insured and the beneficiary perish as the result of a common disaster the proceeds are to be distributed as if the insured had survived unless by sufficient evidence it is shown that the beneficiary survived. Thus it appears that regardless of any reservation of the right to change the beneficiary, the burden of proof as to the survival of the beneficiary is placed on his personal representative.

The gist of appellant's points on appeal is that there was not sufficient evidence introduced to support the court's finding that Mrs. Webster survived her husband. This contention necessitates a thorough review of the evidence. All of the evidence on behalf of respondent consisted of the testimony of Arthur W. Heiligtag and Arthur Hartrup. Heiligtag, a funeral director and embalmer for 20 to 25 years, who was a partner in two funeral establishments, one at Imperial and the other at Antonia, testified on direct examination that in response to the request of a passing motorist he drove his ambulance to the scene of the accident (from where is not stated), just north of Pevely, arriving around 5:15 P.M. He saw a 1956 Chevrolet, which had been totally demolished. There were five occupants, two adults and a young boy in the front, and two adults in the back. He realized he could not take all of them in his ambulance and asked the patrolman to call for additional ambulances. With the help of some bystanders he proceeded to try to get the injured out. One lady (whom it seems to be conceded was Mrs. Webster, and will be so referred to) was on the back seat, just in back of the driver. The upper part of her body was out of the car, (the witness indicated the extent, but what he indicated is not stated in the record) with her head hanging down. She was bleeding very extensively, and it appeared she was injured inwardly. The blood was spurting from her head, and flowing, but not spurting, from her ears. She was lying still, but to his knowledge she was breathing. Mrs. Webster was taken out of the car first because, " * * * we thought possibly we could do something with her, yet." She was placed on the regular cot in the ambulance, and at that time showed visible signs of life. He based that "on the fact that the blood was spurting from her body, as an indication she was hurt bad" ; he learned that from his experience in his work. A Mr. Arnold was placed on the auxiliary stretcher and put in the ambulance. Then two ladies brought a four or five months old baby, who was living, from the other car involved in the accident and put the baby in the front of the ambulance. He drove the ambulance to the Jefferson Memorial Hospital, located in Festus. There were visible signs of life when he put Mrs. Webster in the ambulance. When he rolled Mrs. Webster into

the emergency room the doctor pronounced her dead. It took him possibly 15 or 20 minutes to get to the hospital after he placed Mrs. Webster in the ambulance. He drove, and no one rode in the back with the people.

As to the other occupants of the car in which Mrs. Webster was a passenger, Heiligtag stated that he did not thoroughly examine them, but did casually glance at them. He saw no movement, no visible signs of life. Some bystanders helped remove them from the car. He saw all of the bodies. The other lady in the back, Mrs. Arnold, was taken out of the car and placed on an auxiliary stretcher; "* * * we could find no visible signs of life in her, whatsoever." The little boy was laid outside the car on the ground, or pavement. Mr. Arnold was placed on the auxiliary stretcher, which completed the load in the back of his ambulance. The other occupants of the Chevrolet were left there by him. At the time he put Mrs. Webster in the ambulance the other four people did not show signs of life. He based that on casually glancing at them.

The Prudential had also issued a policy on the life of Roger L. Haus, the two year old son of Mrs. Webster by a former marriage, who was the boy described by Heiligtag as being in the front seat. When a controversy developed between Mrs. Webster's Administrator and Edwin L. Zohner, Administrator of Roger's estate, the Prudential filed a similar interpleader suit. On motion of the respondent here, the two suits were consolidated and heard together. It should be added that judgment below in that action was likewise in favor of Mrs. Webster's Administrator, from which Roger's Administrator did not appeal. On cross-examination by Mr. Zohner the respondent's witness Heiligtag again stated that Mrs. Webster "* * * was laying out of the seat like that. (Indicating)"—(no explanation of what he indicated in the record). Asked whether it was possible that a person could be dead, and leaning over like that, and have blood running out

of her head he answered, "Yes, but it wouldn't spurt from it." He repeated that the blood was not spurting from Mrs. Webster's ears and explained that "Very seldom, in our experience, would we find it spurting from an inward cranial injury." He insisted that the blood was spurting from her head, from above her hairline. She was lying completely still. He did not check her for a heartbeat, and explained that he did not do so because "Well, from our experience in handling so many accidents, when we find someone like that, who we think are alive, it is an indication to us, that we should try to get them to the hospital at once." He went to a school to learn his profession and acquired some medical knowledge—took courses in anatomy, bacteriology, and organic and inorganic chemistry. He did not handle the little boy who was in the car, nor thoroughly examine him, but did casually glance at him. He could not see anything, there was no visible sign of life, and he assumed that the boy was dead.

On cross-examination by the appellant's attorney Heiligtag testified that he looked at Mr. Webster casually; he appeared to be in the front seat of the car, but that he couldn't exactly pinpoint it. He never pronounces anyone dead—medical people actually do that, to establish the time of death.

Arthur Hartrup, the other witness called on behalf of respondent, testified that he was by occupation a machinery foreman. He was on his way from Piedmont to St. Louis when he came upon the wreck, near Pevely. He stopped to see what had happened. There had been a head-on collision, and the cars were torn up badly. He saw four people in the Chevrolet, a man and a woman in the front seat, and a man and a woman in the back seat. The lady in the back seat was hanging out the door, and was just laying there. From where he was standing it looked like the blood was coming from her head. He got within 5 feet of her. He also walked around the car and looked at the other people. They were just laying

there. The steering wheel had been pushed up into the face of the one who had been driving, and the woman in the front seat was kind of slid down towards the floorboards; the one man in the back was kind of laying up over the front seat. Two fellows kind of placed him back in the seat "* * * and he kind of drew a long breath, and kind of slumped in the seat." Later he found out the lady (in the back) was Mrs. Webster. He doesn't know whether or not the blood was spurting from her head, from where he was standing he could see it was dripping on the side where she was hanging out. Asked if any of the other people moved in the car, or showed any sign of movement when he looked at them he answered, "No, only the man that was in the back seat, he kind of drew a long breath, and that's all."

Cross-examined by Mr. Zohner, Hartrup stated that the four people he saw in the car were all adults, and that he didn't see any child in there. He did not see the two cars collide.

Cross-examined by Mr. Challis, appellant's counsel, Hartrup was asked:

"Q. You saw a man in the back seat, is that right?

"A. Yes, sir.

"Q. You saw him breathing, is that correct, sir?

"A. When the two fellows kind of sat him down in the seat, I saw him take a long breath.

"Q. His body moved when you observed that?

"A. Yes.

"Q. Did you ever see the women move, at all?

"A. No, sir."

Subsequently the witness Hartrup was recalled to the stand by respondent, and on the claim of surprise, respondent was permitted by the court to interrogate Hartrup about an affidavit he had made on March 5, 1960, before the trial. Over objection of appellant, respondent was permitted to develop that in the affidavit Hartrup had stated that the man in the rear who was placed back on the seat by two men, "that he slumped over in the seat and apparently died."

The only other witness who testified to having been at the scene was Herman A. Ellenberger, a State Highway patrolman, called by defendant Zohner, who stated that he answered a call to investigate the accident. He found two cars had been involved in actual contact, and a Greyhound bus that had run off the road to avoid striking the two cars ahead. He recalled that there were bodies in the '56 Chevrolet sedan when he arrived, and that he assisted in removing some of them. In removing the bodies he did not observe any signs of life about any of the occupants of the car.

On cross-examination he stated that he saw five persons in the car, but didn't know one from the other. Asked if he saw Mrs. Webster bleeding he answered that he didn't know who she was. And when inquiry was made as to whether he had observed a lady in the back, hanging out of the car, he replied that he did not recall; that he had so many of those (accidents) that he could not remember specifically.

Appellant offered and there was received in evidence, as his exhibits numbered 5 and 6, death certificates of Wayne R. Webster and Velma P. Webster, respectively. In both the time of death was stated to have been at "5:30 p." on July 18, 1959, and the cause as "trauma due to auto accident." In that for Mrs. Webster the time of injury was stated to have been "5:15 p. m." While in the certificate for Mr. Webster it was given as "5:30 p. m." However, in both certificates the box headed "Interval between onset and death" had a long dash drawn in the space provided for an answer. Both certificates were signed by "James C. Rehm, D.C., Coroner."

Was there "sufficient evidence" within the meaning of that phrase as used in Section 471.040, which will support a finding that Mrs. Webster survived her husband? In construing the same term as employed in Sections 471.010 and 471.030 of the Simultaneous Death Act the Supreme Court in Schmitt v. Pierce, Mo., 344 S.W.2d 120, 123, equated the word "sufficient" with that of "substantial" and quoted with approval the definition of substantial evidence stated in Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 141, as follows: " * * 'Substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.' * * *" The court cited Taylor v. Cawood, Mo., 211 S.W. 47, where the evidence of survivorship was considered "substantial" and Warren v. Aetna Life Ins. Co. of Hartford, Conn., 202 Mo.App. 1, 213 S.W. 527, 530, where survivorship was established " * * * according to a preponderance of the testimony and reasonable inferences to be drawn therefrom" and concluded its discussion with the statement (344 S.W.2d p. 123) that:

"* * * Our early rulings on sufficient evidence of survivorship are in accord with rulings in other states under the Act. Sauers v. Stolz, 121 Colo. 456, 218 P.2d 741, 743, states (loc. cit. 742[2]): '[T]he fact of survivorship requires no higher degree of proof than any other fact in the case.' See also Prudential Ins. Co. of America v. Spain, 339 Ill.App. 476, 90 N.E.2d 256, 259[2]; White v. Taylor, 155 Tex. 392, 286 S.W.2d 925, 927; 16 Am.Jur. 34, §§ 42, 43, and appendix; Annotation 20 A.L.R.2d 235; 25 C.J.S. Death § 12, p. 1071."

In the light of such standards, we are of the opinion that " * * * men of ordinary reason and fairness, in the light of the facts as they appear in this record, * * *" Warren v. Aetna Life Ins. Co. of Hartford, Conn., supra, 213 S.W. p. 530, would come to the conclusion that Velma Webster had survived her husband, Wayne R. Webster, and we so hold. Certainly the evidence and the reasonable inferences to be drawn therefrom are as substantial as they were in that case. The testimony of Heiligtag, a funeral director and embalmer for 20 or more years, who had studied anatomy and apparently had had considerable experience in handling victims of similar catastrophes, is sufficient to establish that Mrs. Webster was breathing when he arrived on the scene, and that she was alive both then and when he placed her in the ambulance to take her to the hospital. And while Heiligtag stated that he did not make a thorough examination of the body of Mr. Webster, he testified that he saw no movement or visible sign of life either on the part of Mr. Webster or of the other three occupants of the automobile. As to the testimony of Hartrup, disregarding the opinion expressed in his affidavit that Mr. Webster "apparently died," (see Schmitt v. Pierce, supra, 344 S.W.2d pp. 128, 129 as to the opinion of a lay witness on the issue of death), there remains sufficient evidence from which the inference may be drawn that Mr. Webster drew a final breath and expired as the two unidentified men sought to straighten him up on the back seat of the car.

Appellant also asserts that the death certificates showing that the time of death of both Mr. and Mrs. Webster " * * * are prima facie evidence of the facts therein stated and here control the weight of the evidence." We readily agree that by statute a certificate of death is prima facie evidence of the facts required to be stated therein. Section 193.170; Randolph v. Supreme Liberty Life Ins. Co., 359 Mo. 251, 221 S.W.2d 155. " * * * But it is prima facie only and is not to be taken as conclusive when other facts brought forward explain or contradict it as to make a submissible issue of its verity. * * *" Pfingsten v. Franklin Life Ins. Co., Mo., 330 S.W.2d 806, 815. Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333. Here evidence was brought forward to contradict

the statement in the certificate that the deaths of both Mr. and Mrs. Webster occurred at 5:30 P.M. So far as the weight to be given to the certificate is concerned, there is nothing in the record to indicate that the coroner had personal knowledge of the facts, Felker v. Metropolitan Life Ins. Co., Mo.App., 288 S.W.2d 26, and its effect is to some extent weakened by the obviously erroneous statement that Mrs. Webster was injured at 5:15 P.M. and Mr. Webster at 5:30 P.M.

The respondent's motion to dismiss the appeal should be overruled and the judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court. Accordingly, respondent's motion to dismiss appeal is overruled and judgment affirmed.

RUDDY, P. J., and ANDERSON and WOLFE, JJ., concur.