LEVI T. BURTON, Administrator, Respondent, v. CHICAGO & ALTON RAILWAY COMPANY, Appellant.

**Kansas City Court of Appeals, January 19, 1914.**

1. **NEGLIGENCE: Humanitarian Rule: Drunkenness: Railroad Crossing.** Three men left Fayette, Missouri, just after midnight, in a one-horse buggy, for their home fifteen miles away. They were drunk and soon fell asleep, but the horse being gentle, proceeded on in a walk. When about ten miles out they came to a railroad crossing at three o'clock, when a passenger train was due. Just as the horse had pulled them onto the crossing, still drunk and asleep, the train, running forty-five or fifty miles an hour, came upon them and killed one. The night was starlight. There was evidence tending to show that the crossing was covered by the light of the engine's headlight when it was near 600 feet away, and that the engineer could have seen them in peril for that distance and that the train could have been stopped in less than that distance. It was *held* that a case was made for the jury under the humanitarian rule.

2. **WITNESSES: Impeachment: Contradiction.** While a party cannot impeach his own witness yet he is not concluded by the testimony of such witness and he may show a state of facts from other sources which, though contradicting the witness, makes a different state of case from that which the witness's testimony tended to show.

3. **NEGLIGENCE: Statutes: Humanitarian Rule.** The statute (Sec. 5425, R. S. 1909), allowing, in actions against corporations for death, damages in a sum not less than two and not more than ten thousand dollars and providing that negligence of the deceased may be shown "as a defense" to the action, was not intended to permit the killing of an individual when it could be avoided by the servants of the corporation, and it did not annul the humanitarian rule.

4. **EVIDENCE: Hypothetical Question: Expert: Waiver.** A hypothetical question addressed to an expert as to the distance in which a train could be stopped, should include the hypothesis of safety to the passengers. But if that is not included in the objections which are made to the question, it is waived.

5. ————: ————: **Like Conditions.** Experiments under substantially like conditions are proper evidence; but the fact that five months elapsed, other conditions being practically the same, is not sufficient reason for excluding such evidence.

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller,* Judge.

AFFIRMED.

*Scarritt, Scarritt, Jones & Miller* for appellant.

*Aubrey R. Hammett* for respondent.

ELLISON, P. J.—Plaintiff is administrator of the estate of May Burton, deceased, and brought this action to recover damages on account of the death of the intestate which he charges was occasioned by the negligence of defendant's servants. The judgment in the trial court was for the plaintiff.

It appears that deceased, a young man about twenty years of age, in company with two other young men attended a fair at Fayette, Missouri, on the 18th of August, 1911. They remained until past midnight when they started for home, a distance of perhaps fifteen miles, in a one-horse buggy. They had been drinking to excess and fell asleep on the way; but the horse being gentle and seeming to know the road, kept on his way in a walk. One of the survivors (the other was not a witness) testified that when they got about nine miles out from Fayette and one mile from where defendant's road crossed the public road, he aroused himself and observing the same steady gait of the horse and that his companions were not awake, he again went to sleep. It seems the horse proceeded on to the crossing where deceased was killed, arriving there at about three o'clock a. m. At that time one of defendant's westbound passenger trains was approaching at a speed of forty or fifty miles an hour, and as the horse and buggy got upon the track they were struck by the engine, deceased being killed and the other two hurt.

The negligence of deceased and his companions is conceded and the case is bottomed entirely upon the humanitarian rule. The catastrophe happening at a crossing, the question, under the rule, is, did defendant's servants in charge of the engine pulling that train, see the peril of deceased, or could they have seen it had they been in the exercise of proper care, in time to have stopped the train?

It was a starlight night; the engine was equipped with the best of air brakes and a powerful headlight. Plaintiff's intestate being killed, his two companions being asleep and the time being three o'clock in the night, he was left without eyewitnesses unless he called upon the engineer and fireman of the engine. And he did so. The engineer stated that though on the lookout, he did not see the men in the buggy, but only the horse, and that when only sixty feet away, and that then, knowing he could not help striking the horse, he shut off steam, applied emergency brakes, and did everything in his power to save the train from ditching. That he struck the horse and succeeded in stopping the train about six hundred feet beyond; that he walked back and for the first time knew of persons being in the buggy. He described a curve in the road and stated that a number of freight cars stood on a "siding" and that these things, together with the length and height of the engine boiler, prevented him from seeing sooner than he did from his lookout in the cab.

While the fact that plaintiff introduced these servants as his witnesses prevents him from impeaching them, yet their testimony does not conclude him on the facts. He may show things from other sources and make out a state of case even though altogether contradictory of what they have said. [Brown v. Wood, 19 Mo. 475; Helling v. United Order, 29 Mo. App. 309; Dun v. Dunnaker, 87 Mo. 597.] In the latter

case the distinction between impeaching one's own wit-
ness and showing matters contrary to what such wit-
ness has testified to is mentioned.

And this, plaintiff proceeded to do. He had three
witnesses go to the crossing at the same time of night
and on the same kind of night and while a man in a
buggy with horse attached was upon the crossing, they
were stationed up the track at a point 460 feet away,
and as the headlight first lighted up the crossing so
that they could see the man sitting in the buggy, the
engine of an on-coming train was sixty feet further
away; thus making the distance of the engine from
the crossing when the headlight first came upon it
about 520 feet. One of these witnesses stated the en-
gine to be some further from where he stood, which,
added to the distance he was from the crossing, would
be about 600 feet. We assume the reason they could
not measure the exact number of feet was that while
they were stationed up the track and observed the first
lighting of the crossing, they would turn their heads
quickly to catch the point or place where the engine was
at that instant and then afterwards measure to that
place. Any difference in the point they caught the
engine would make a difference in that estimate. Tak-
ing this part of the testimony in its most favorable
view for plaintiff, as we must, it would be fair to say
that the jury could consider the test as showing the
headlight of the engine was upon the crossing when
the engine was about six hundred feet away.

But in addition to this, the engineer himself
stated that when he first saw the horse he was sixty
feet away and had gotten over the track. And the
fireman testified that when he walked back after the
train had been stopped, he found the horse, buggy and
boys in a pile—all near together between the main
and sidetracks, but did not know how far they had
been knocked from the crossing. This shows that the

buggy itself was on the track at the moment of collision. The horse approached the track from the south and the engineer coming west, with a slight curve in the track, it had a tendency to throw the broad light of the headlight of the engine, while and before it reflected on the crossing, onto the road south of the crossing and thus to have reflected upon the horse and buggy, or one of them, before they reached the track. Connecting this with the statement of McDonald, a civil engineer, who testified that the curve was a two degree curve and that he made tests of distances from the crossing east (the direction from which the train came), we find that a man on the track at the crossing could be seen, and also that he could be seen a distance of twenty feet south of the track at the crossing. He put the engineer's position on the north side of the engine cab as the same for seeing ahead as a man's would be who was standing four feet north of the north rail; and that a man standing at the latter point, 560 feet from the crossing, had a clear line of vision, unobstructed by the standing freight cars, to a point as far as twenty feet south of the south rail at the crossing. And that a man in such position (four feet north of the north rail) at a point 420 feet from the crossing, had a clear line of vision, unobstructed by the freight cars, to the south rail of the track at the crossing.

Under the rule requiring an appellate tribunal to assume as the facts of the case what the evidence in plaintiff's behalf tends to show them to be and every reasonable inference to be drawn therefrom, we find that the engineer must have seen, or could have seen had he been looking, deceased in the buggy at the crossing, in position of imminent peril, while he was from 420 feet to six hundred feet from him.

The only question remaining to perfect plaintiff's case is, could the train have been stopped in the ex-

Burton v. Railroad.

ercise of ordinary care, in time to have avoided the collision? Plaintiff answered this requirement by introducing three expert engineers who had long experience in running and stopping passenger trains, and they stated that a train of this kind, running at its speed, could be stopped at that place in three hundred feet. Defendant attacks the testimony of these witnesses on the ground that what they stated is so unreasonable as to be unbelievable. In that respect it is only fair to the witnesses to say that it was conceded, and so they considered in their estimate, that it was a two per cent curve and upgrade at that place eighty-eight hundredths of one per cent. But, even with this concession, we would have been more inclined to countenance defendant's view, if it were not for the fact that we consider the evidence ample to justify the jury in believing the engineer had a space of near six hundred feet in which to stop the train after he saw or could have seen the peril of deceased. So far as appears on the record, these witnesses were disinterested and unimpeached—certainly they were qualified to speak.

Defendant makes the point that the statute (Sec. 5425, R. S. 1909) under which the action is brought, permits it to show the negligence of deceased "as a defense" to the action. But that phrase in the statute was not intended to annul the humanitarian rule. It was not intended to permit the servants of a corporation to kill a person when they could avoid it, simply because such person was negligent. It has been recently said, in a case where a man, drunk, laid down on a railway track and was killed by a passing train, that the hunmanitarian rule was fixed in the law of the State to remain until removed by the legislature. [Murphy v. Railroad, 228 Mo. 56.]

Objections were made to hypothetical questions asked expert witnesses as to distances in which trains

could be stopped. The principle complaint is that they did not include the hypothesis of due regard to the safety of the passengers. That should have been embraced in the questions (Burge v. Railroad, 244 Mo. 70, 98; Ruschenberg v. Ry. Co., 161 Mo. 70, 82; Heinzle v. St. Ry., 182 Mo. 528, 555), but defendant is in no position to complain, for the reason that in the specified objections made to them, that is not included. [Longan v. Weltmer, 180 Mo. 322, 340.] There were some other questions to these witnesses objected to, but we think they were proper.

Defendant further objected to the evidence of the witnesses who made the experiments as to the distance the headlight fell upon the crossing, on the ground that they were made several months after the catastrophe. It must strike anyone that an experiment made of a disputed point is a high order of evidence. It is an actual test and determines the question. But the means adopted may destroy its force and even render it unfair and dangerous to the other party. Therefore it is essential that the conditions must be substantially the same. And so the authorities cited by the defendant state. [Lake Erie & W. Ry. Co. v. Mugg, 132 Ind. 168; Seibert v. McManus, 104 La. 404; Zimmer v. Ry. Co., 123 Wis. 643.]

Giving due regard to the verdict of the jury and the approval of it by the trial court, as the law requires us to do, we would affirm the judgment in its entirety but for the following consideration. The verdict was in the sum of $3000, when there was no evidence of pecuniary loss. The penalty allowed by the statute without regard to pecuniary loss is $2000, and plaintiff concedes the judgment is excessive in the sum of $1000. The judgment will therefore be affirmed for $2000. [Boyd v. Railroad, 249 Mo. 110.] The costs of the appeal taxed against plaintiff. All concur.

## ON MOTION TO TRANSFER CAUSE TO THE SUPREME COURT.

A motion for rehearing was filed by defendant and has been overruled. But again insisting that our opinion is contrary to the decision of the Supreme Court in Burge v. Railroad, 244 Mo. 76, defendant asks us to certify the cause to that court for final determination as provided by section 6, article 6 of the Constitution, Amendment 1884. In view of this renewal of defendant's contention that the Burge case determines this case in its favor, we will endeavor to state in some detail our views on that subject, in which we will undertake to show that that case is altogether unlike this.

The point in controversy relates to the propriety of hypothetical questions put by plaintiff to expert witnesses as to the distance in which a train, under certain conditions, may be stopped. Perhaps nothing is better known, or oftener stated by the courts, than that rule of practice which requires one in objecting to a question asked a witness to state the specific reason why he objects and which confines him, on appeal, to the objections he has specified. If this rule may be said to be justified in one instance more than another, it would be in objections to hypothetical questions to expert witnesses. For they are generally of considerable length, and some detail may unwittingly be omitted. So the opposing party is required to state the ground of his objection, for, if it be good, the question may be immediately made proper by correction. If the objector state grounds of objection, he must be candid about it and name all he proposes to rely upon. The propounder of the question has the undoubted right to assume when the objector specifies his objections that he is not holding any back wherewith to trip him in an appellate court. To permit such practice would reduce a trial to a low level. In

Longan v. Weltmer, 180 Mo. 322, 340, there was a general objection in the words "for the reason it is not a proper hypothetical question." In disposing of the point on appeal the court said, "If the objection had been pointed out it is probable that it could have been obviated, and in fairness to plaintiff she should have been afforded an opportunity of doing so, had she so desired." The court cited the cases of Howland v. Railroad, 110 Cal. 513, and Crocker v. Carpenter, 98 Cal. 415, 421. In each of these cases it is said that, "This is not laying down a merely technical rule. It is one which has its foundation in the proper consideration of what is due to the court and adverse counsel in the trial of a case," and that the rule "is really to avoid technicalities and prevent delay in the administration of justice."

The objection made in this court is that the hypothetical question, as to the distance in which a train could be stopped, did not include the qualification of safety to the passengers. But that objection was not made in the trial court and it is now brought forward as a ground for overturning the judgment, notwithstanding it was not mentioned at the trial. Defendant in endeavoring to avoid the ruling of the Supreme Court in Longan v. Weltmer, supra, says that the objection in that case being in the general terms above quoted, was different from the specific objections made in this case. If we allow that defendant's objections at the trial really specified particulars of objection it discloses only a greater reason for refusing to entertain the objection it now makes; for, when a person enters into specification, it would be manifest unfairness to allow him to omit one and hold it in reserve for use in the appellate court.

The question asked one of the witnesses (the two others being practically the same) is as follows:

"Q. In your opinion, Mr. Williams, in what distance on a dry track, at 3:10 in the morning in the summer time going up an 88/100 of one per cent grade, on a track with a two per cent curve, could you stop a passenger train consisting of an engine and six coaches, the engine having three driving wheels on a side, equipped with brakeshoes, and four wheels under the tender equipped with brakeshoes, and all of the coaches throughout the train equipped with brakeshoes, carrying seventy pounds pressure in the train line and ninety pounds pressure in the reservoir, if your braking system and air were good throughout the entire system, and running about forty miles an hour?"

The objection was as follows:

"We object to the question for the reason that it does not include the essentials in evidence so as to make it include the conditions at the time of the accident, and for the further reason that it calls for an improper conclusion of this witness; it assumes also facts that are not in evidence and does not include facts as shown with reference to this particular train and place."

It will readily be observed from this, that to permit defendant to add to that objection, in this court, the point that the question omitted the qualification of safety to passengers, would be to sanction a most unfair practice.

The hypothetical question asked in the Burge case (page 97) was as follows:

"I will ask you to state to the jury how long, in your judgment, based upon your experience as a railroad man and your knowledge of the appliances—railroad appliances—would it take a train composed of an engine and three cars—passenger coaches—to make a stop in an emergency at sixty miles an hour, in what distance?"

Omitting verbiage, that question was merely this: "In what distance would it take a train composed of an engine and three passenger cars to make a stop in an emergency (running) at sixty miles an hour" The decision (p. 101) as to this question was that it did not place before the witness any facts upon which he could predicate an opinion, and that his answer was therefore without probative force. The question with which we are dealing, viz., whether the objecting party should be allowed an objection in an appellate court which he did not make in the trial court, did not exist in that case and, of course, was in no way considered or referred to. It is true Judge GRAVES (pp. 98-101) criticizes the question and refers to several objectionable features, among others to the fact that it omitted the element of safety to passengers, though that was not one of the points of objection. But there is not the remotest suggestion that a party could raise objections in the appellate court which were not made in the trial court.

The question asked at the trial in the Burge case is so unlike the question asked by plaintiff in this case as to leave them outside the pale of comparison. Referring to the foregoing copy of the question in this case, it will be seen that it embraces ample hypothesis drawn from the evidence upon which a proper opinion of probative force could be based, an essential wholly lacking in the Burge case. As we have just stated, the decision in the Burge case was that the witness "had placed before him no facts upon which he could predicate a valuable opinion." But in this case every detail of kind of engine, cars, wheels, brakes, air pressure, grade and curve of track, and speed of train is submitted. So that our conclusion is, that instead of the cases being similar, they can more correctly be stated to be unlike in all essential particulars.

But there are other reasons showing defendant to

Burton v. Railroad.

be without standing on the foregoing matter. In the first place the examination of one of the three witnesses for plaintiff on this subject, discloses that in point of fact it was assumed that safety to passengers was understood to be considered in the answers given. Thus, on cross-examination by defendant, witness Williams was asked, "Don't you know that if you run a train forty or fifty miles an hour and you stopped in 275 feet, you would throw everybody out of the train?" And he answered, "No, I don't know it and you don't either."

Again, it is conceded by defendant that it would have been its duty to point out specific objections if requested by the court or opposing counsel. The trial court made that very request in the examination of witness Wray. When the objection was stated, the court asked of defendant's counsel, "On what particular ground?" and no further answer was made than that "the witness is not shown to be qualified to testify as an expert."

In addition to this, the undisputed evidence was, as stated by the engineer himself, that when he did begin his effort to stop he was near the crossing where the track became level and straight and that he did everything that could be done to stop it as quickly as was possible. He stated that he shut off steam, put on the airbrake, put it into the emergency and stopped as quickly as possible. That "I put it all on, as we call it." At this point the up grade and curve of the track had ceased and yet without the advantage of these conditions, the engineer's evidence shows that he did stop within 600 feet.

Then when it came to the instructions, defendant in number 4, had the court declared it entitled to the verdict if the engineer "did all he could in the exercise of ordinary care, to stop the train after he realized that

a horse,'' etc., omitting any reference to safety of passengers. Thus it is made apparent that the point now made on the omission of reference to safety of passengers is a thought arising after the trial. All concur.