Robbie SCHMITT, Mildred Lois Killion, and L. B. Buchanan, and George T. Killion, Administrator of the Estate of Lois Pierce, Deceased, Respondents,

v.

Robert O. PIERCE and Helen Hinchey, Administrator and Administratrix of the Estate of Otho Pierce, Deceased, Robert O. Pierce and Helen Hinchey, Appellants, Shirley Ann Pierce, a Minor, and L. G. Pinkley, Guardian of the Property of Shirley Ann Pierce, a Minor, Defendants.

Robbie SCHMITT, Mildred Lois Killion, and L. B. Buchanan, and George T. Killion, Administrator of the Estate of Lois Pierce, Deceased, Respondents,

v.

Robert O. PIERCE and Helen Hinchey, Administrator and Administratrix of the Estate of Otho Pierce, Deceased, and Robert O. Pierce and Laura Pierce, his wife, and Helen Hinchey and Harold Lloyd Hinchey, her husband, Appellants, Shirley Ann Pierce, a Minor, and L. G. Pinkley, Guardian of the Property of Shirley Ann Pierce, a Minor, Defendants.

No. 47537.

Supreme Court of Missouri,

En Banc.

Feb. 13, 1961.

Rehearing Denied March 13, 1961.

McHaney & McHaney, Kennett, Ward & Reeves, Caruthersville, for appellants.

Roberts & Roberts, Farmington, for respondents.

BOHLING, Commissioner.

Otho Pierce and Lois Pierce, his wife, perished February 19, 1958, the result of an automobile collision. Each died intestate. The fact issues in the trial court were: Did one survive the other, or did they die simultaneously within the meaning of the Uniform Simultaneous Death Act, Chapter 471. (Statutory references are to RSMo 1949 and V.A.M.S.) Defendants make no point on appeal that there was sufficient evidence to establish that Mr. Pierce survived Mrs. Pierce. Mr. Pierce's real and personal property was valued at well over $250,000. The two also held title to real estate by the entirety. Robbie Schmitt, Mildred Lois Killion and L. B. Buchanan, children of Mrs. Pierce by her former husband; Robert O. Pierce and Helen Hinchey, children of Mr. Pierce by his former wife, and Shirley Ann Pierce, 15-year-old daughter of Mr. and Mrs. Pierce constituted all the heirs at law of either decedent. Mrs. Pierce's children and the administrator of her estate instituted two actions against the children of Mr. Pierce, Mr. Pierce's personal representatives, and Shirley Ann, who appeared by her guardian. No issue is presented respecting any pleading. One action was for a declaratory judgment to determine how the assets of the estates of Mr. Pierce and Mrs. Pierce should be distributed. The other action, in which Mr. Pierce's children's spouses were joined as defendants, was to quiet and determine the title to real estate held by Mr. and Mrs. Pierce, individually or as tenants by the entirety. The two actions were consolidated and tried to the court by consent of the parties. At the close of the evidence the trial court found that Mrs. Pierce survived Mr. Pierce, and adjudged that Mrs. Pierce's heirs had title to the property held by Mr. and Mrs. Pierce by the entirety and an undivided one-half interest in the separate estate of Mr. Pierce. The defendants, with the exception of Shirley Ann and her guardian, have appealed.

It is our duty to review jury waived cases "upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." § 510.310, subd. 4. We recognize that the court's finding is not binding on us; that the question is not merely whether the court's findings are supported by substantial evidence; and that we are to make our independent investigation and reach our own conclusions as to the weight of the evidence. Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289, 290[1]; Wyler Watch Agency v. Hooker, Mo.App., 280 S.W.2d 849, 855[10, 11]. Where, however, there is irreconcilable conflict in the evidence on essential fact issues the admonition in § 510.310, subd. 4, to give due deference to

the opportunity of the trial court to judge the credibility of the witnesses and not set aside the judgment unless clearly erroneous is appropriate. Cases supra; Erickson v. Greub, Mo., 287 S.W.2d 873 [1]; Dunlap v. Hartman, Mo., 338 S.W.2d 10.

The Simultaneous Death Act, in § 471.-010, provides: "Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, as determined by a court of competent jurisdiction, the property of each person shall be disposed of as if he had survived * * *."

And § 471.030 of said Act provides: "Where there is no sufficient evidence that * * * tenants by the entirety have died otherwise than simultaneously as determined by a court of competent jurisdiction, the property so held shall be distributed one-half as if one had survived and one-half as if the other had survived. * * *"

Missouri courts are admonished by the Act "to effectuate its general purpose to make uniform the law in those states which enact it." § 471.070.

Under the statutes quoted supra, the property of each commorient is to be disposed of as if he had survived where "there is no sufficient evidence that the persons have died otherwise than simultaneously." This creates no presumption; but by its terms it is applicable where there is "no sufficient evidence" of survivorship. Missouri has had no presumption relating to survivorship. Stewart v. Russell, Mo., 227 S.W.2d 1011, 1013[4].

In Taylor v. Cawood, Mo., 211 S.W. 47, 50[1, 2], the evidence of survivorship was considered "substantial." See also Stewart v. Russell, Mo., supra [7]. Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 141[4], states: " 'Substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.' " In Warren v. Aetna Life Ins. Co., 202 Mo.App. 1, 213 S.W. 527, 530, survivorship was established "according to a preponderance of the testimony and reasonable inferences to be drawn therefrom." We are not unmindful of statements in State ex rel. Sterling v. Shain, 344 Mo. 891, 129 S.W.2d 1048, 1051[7, 10], and Terminal R. R. Ass'n of St. Louis v. Schmidt, 349 Mo. 890, 163 S.W.2d 772, 774[1], cases involving different factual situations and legal principles. Our early rulings on sufficient evidence of survivorship are in accord with rulings in other states under the Act. Sauers v. Stolz, 121 Colo. 456, 218 P.2d 741, 743, states (loc. cit. 742[2] ): "[T]he fact of survivorship requires no higher degree of proof than any other fact in the case." See also Prudential Ins. Co. of America v. Spain, 339 Ill.App. 476, 90 N.E.2d 256, 259[2]; White v. Taylor, 155 Tex. 392, 286 S.W.2d 925, 927; 16 Am.Jur. 34, §§ 42, 43, and appendix; Annotation 20 A.L.R.2d 235; 25 C.J.S. Death § 12, p. 1071.

Another contention of defendants, i. e., Mrs. Pierce was not a "surviving spouse," would bring this review to an early termination, plaintiffs conceding she was dead upon arrival at the hospital. The gist of defendants' argument, broadly stated, is that certain provisions of the New Probate Code condition certain rights of or allowances to a surviving spouse upon an exercise of the right or receipt of the allowance prior to the death of such surviving spouse. They cite §§ 474.200 and 474.300; State ex rel. Baker v. Bird, 253 Mo. 569, 162 S.W. 119, 123[9]; Borden v. World War II Service Compensation Board, 243 Iowa 892, 54 N.W.2d 496, 501[3, 4]. Defendants' position might well be given consideration by the lawmakers (consult Wigmore, Evidence, 3d Ed., § 2532a, p. 487; Baldwin's Ohio R.C.2dEd., § 2105.21); but the case before us is governed by the provisions of the Uniform Simultaneous Death Act and not by statutes relating to other subject matters.

■ The death of one a short time after the death of the other is sufficient for the

survivor to act as a conduit of title to the heirs of the survivor. In re Di Bella's Estate, 199 Misc. 847, 100 N.Y.S.2d 763, 770, stating "If the proof is sufficient, one second would be enough." See, among others, Taylor v. Cawood, Mo., 211 S.W. loc. cit. 51; Warren v. Aetna Life Ins. Co., supra, 213 S.W. loc. cit. 530. The contention is overruled.

This case differs from most of the like cases we have read in that many persons arrived soon after the collision and there is much conflict in the testimony of the witnesses and some confusion. To detail and discuss all the contentions presented would unduly extend this opinion. We shall endeavor to keep it within reasonable limits. In this connection we do not burden the opinion with testimony of plaintiffs' and, in one or two instances, of defendants' witnesses which our study of this record shows is so overwhelmingly against the weight of the credible evidence as not to influence the result, although some testimony is included which is not considered in reaching our ultimate conclusion on the facts.

The collision occurred about 1:05 p. m., February 19, 1958, a cold day, about 10 miles south of Poplar Bluff on Highway 53. Mr. Pierce, driving, was northbound, with his wife on the front seat and her sister, Mrs. Hattie O. Burris, on the back seat. Mr. E. Ora Knoll was driving south. The cars were Oldsmobiles. Highway Patrolman Kenneth Link saw the collision, stating the cars hit in the center of the northbound lane, spun, and blocked the highway. He immediately radioed Poplar Bluff for an ambulance.

The collision was very heavy. The front of each car was pushed back. The metal dash of the Pierce car was bent about eight inches out of line and its windshield had a hole, about eighteen inches in circumference, on the passenger side. Mr. and Mrs. Pierce died in or soon after the collision and Mr. Knoll the following morning. Mrs. Burris was severely injured but talked to persons at the scene.

We outline the injuries received by Mr. and Mrs. Pierce.

Trooper Link testified there was a cut and blood on the lower part of Mr. Pierce's mouth and chin, and he was sitting behind the wheel in an upward position with his neck stretched and his head near the top of the car. Defendants' witnesses Hightower, Barker, Wilburn and Jones gave testimony to the effect Mr. Pierce was slumped over the steering wheel of his car; but, with the exception of Wilburn who was not questioned about the exhibit, when shown defendants' exhibit H, a picture of the Pierce car taken at the scene, did not dispute that its steering wheel was shown pushed up and back. Hightower stated Mr. Pierce had part of the steering wheel in his mouth.

Noel Dean, first called by plaintiffs and an experienced mortician, embalmed the bodies of Mr. and Mrs. Pierce. He testified that Mr. Pierce's main injuries consisted of a severe blow and cut on the point of the chin which broke and separated the jaw bone down in the mouth under the tongue and the cut was to the esophagus; and that his neck was broken just below the skull so badly he had to prop the head to hold it in place.

Witness Dean testified Mrs. Pierce had a three or four inch cut diagonally across the left eye extending up and back towards the ear and exposing the frontal bone; a severe bruise above the left eye on the frontal bone extending up to the hair line and over the center of the forehead; a four or five inch cut, rather than a blow, about one and a quarter inches above the base of the skull, running diagonally across and through the bone structure, with bone fragments extending out; fractures of both arms and both legs, several broken ribs, bruised chest, and first joint, third finger, left hand, missing. He stated her neck was broken about midway between the shoulders and skull, and he could feel, but couldn't hear, the bones grate. The ulnar artery was ruptured. On cross-examination, received subject to plaintiffs' objec-

tion, in his opinion Mrs. Pierce's death was instantaneous. On redirect, in answer to whether he had informed plaintiffs' counsel he could not tell whether Mr. and Mrs. Pierce died simultaneously or when either died, he stated all he could give was his opinion as to the extent of their injuries:

"Q. And that you couldn't give an opinion as to when they died?

"A. That is right. Not exactly."

Witnesses testifying to facts at the scene appear to have arrived as follows: Trooper Link arrived first. Mr. and Mrs. Roy Hightower lived about 200 yards from the collision. He heard the crash, called to his wife and Mr. and Mrs. Paul Barker, who were at his home, and ran to the scene. Barker, Royce Wilburn, with Eric Jones, his passenger, and Everett Clark arrived, we understand, before any person was removed from the cars. Homer Swift arrived as Mrs. Pierce was being placed on the shoulder of the highway. Mrs. Barker and Mr. and Mrs. L. D. Askew arrived after two persons had been removed from the cars. Mrs. Pearl Metcalf and Orville Thompson arrived about the time and the other witnesses arrived after Mr. Pierce was placed on the shoulder.

Trooper Link first went to the Knoll car where Mr. Knoll was pinned under the dash, and then to the Pierce car where Mr. Pierce was "under the wheel," with his wife to the right on the front seat. He felt Mr. Pierce's pulse and "couldn't find any." Defendants say their witnesses Hightower, Barker, Wilburn and Jones did not see this, but we do not read the record to establish that they were there when the Trooper took Mr. Pierce's pulse. He did not take Mrs. Pierce's pulse. Link testified there was confusion at the scene; a lot of people stopped and most of them, including himself, were a little nervous and excited. He had help; he did not know whom, in removing the occupants from the cars, and thought, but was not sure, they were removed in the following order: Mr. Knoll, Mr. Pierce, Mrs. Pierce and Mrs. Burris. Defendants' witnesses Hightower, Jones, Wilburn and Barker testified they were removed in the following order: Mrs. Pierce, Mrs. Burris, Mr. Knoll and Mr. Pierce. Mrs. Pierce was placed on the east shoulder north of the Pierce car, its rear wheels being off the pavement. Mrs. Burris was placed south of the Pierce car, and Mr. Pierce south of her. Mr. Knoll was placed on the west shoulder.

Defendants' witnesses Hightower and Barker each testified he helped Trooper Link remove Mrs. Pierce. Hightower testified the Trooper carried the upper and he carried the lower part of Mrs. Pierce's body. Wilburn stated he helped remove Mrs. Pierce. Link testified Mrs. Pierce was bleeding from the ears before they moved her, and he distinctly heard her moan or groan when they moved her. Hightower, Barker and Wilburn each testified he did not hear Mrs. Pierce moan or groan while moving her.

Mrs. Pierce's trunk was covered with a coat from the Pierce car and later with a blanket. Her face and head were never covered. Mr. Pierce's body, including his head, was completely covered.

Hightower first testified he did not leave the scene until all the bodies had been removed, but later admitted he went north a short distance to flag traffic before he viewed the bodies with the Trooper, and that he later went to his house for blankets or covers.

Trooper Link, Mr. and Mrs. L. D. Askew, Mrs. Pearl Metcalf, Sollen E. Bridewell and Mrs. Burris, plaintiffs' witnesses, testified to observations at different times of hearing Mrs. Pierce while she was lying on the shoulder of the highway and not being moved.

Trooper Link and Bridewell had taken first aid training. Mrs. Metcalf had helped out some at a funeral home. Link testified that he went "back and forth to these people" on the shoulder, three or four times

to Mrs. Pierce, trying to aid her. The testimony of Link, Mrs. Metcalf, Bridewell and others warranted findings that Mrs. Pierce was bleeding from the ears, nose and mouth. Link stated he tried to stop Mrs. Pierce's bleeding by applying pressure but did not stop it; he wiped blood from her face, kept wiping blood off her mouth. Bridewell stated he saw this, and the blood would come, ooze, back.

Link described the blood coming from Mrs. Pierce's ears as "pumping" from her ears; and Mrs. Metcalf described it as a "rhythm like" pumping, like "pumping a pump."

Trooper Link, Mr. and Mrs. Askew, Mrs. Metcalf and Bridewell each testified to observing bloody air bubbles at Mrs. Pierce's nose; which would go in and out (Mrs. Askew), or get big and small (Mr. Askew), or go back and forth, come and go (Mrs. Metcalf), or come out and burst as she breathed (Bridewell). Charles Mungle, a mortician, drove the ambulance bringing Mrs. Pierce and Mrs. Burris to Poplar Bluff. He testified by deposition that when he arrived at the scene he knew Mrs. Pierce "was mighty weak. There was a bubble raised up and popped on her mouth, but as far as any indication of life or death, I don't know." The ambulance arrived at the scene about 20 to 30 minutes after the collision.

Trooper Link and Mrs. Burris testified to hearing moans or groans from Mrs. Pierce while she was on the shoulder.

Mrs. Askew stated she saw Mrs. Pierce's chest move in and out, like she was breathing; and from the bubbles on her nose going in and out, she assumed Mrs. Pierce was breathing. Bridewell stated he did not observe Mrs. Pierce breathing "but she did gasp in a manner a person still breathing would. (Witness makes two sounds.) Like that." Mrs. Askew stated she observed muscles in Mrs. Pierce's face, her cheeks, move and her eyes bat.

Mr. Askew stated he observed "some kind of movement," "enough to notice it"

by one of Mrs. Pierce's legs. He testified Mr. Pierce's chin had been "mashed in and broke up." "He had been bleeding but by then the blood wasn't flowing. It had dried." He was lying there lifeless. He later saw Mrs. Pierce. "She was bleeding, and had a lot of blood on her."

Bridewell testified that while Mr. Pierce was on the shoulder his head was twisted completely out of line with his body. Defendants' witness Barker stated it was not twisted.

Defendants would discredit Trooper Link's testimony because he talked to Trooper Harold Schmitt, who married a daughter of Mrs. Pierce, and a plaintiffs' lawyer on one occasion and was told Schmitt's wife would inherit a "sizeable sum" if Mrs. Pierce survived Mr. Pierce. Link had also talked to defendants' lawyers.

Defendants say Mr. Askew is a convicted criminal. The record discloses that in 1943, approximately fifteen years before this trial, he pleaded guilty to a common assault and was fined $50.

Defendants say witness Metcalf committed perjury and the trial court apparently believed this perjurer. The witness testified she had helped out, like dressing people, in the embalming room of the Landess Funeral Home, had made ambulance trips with others, and had helped at funerals. Defendants stress an affidavit of Christine Landess, made a part of defendants' new trial motion, tending to refute this testimony of the witness and that witness had been a part time employee for about twelve years solely to collect burial dues. Only where it is clearly disclosed that a trial court has abused its discretion in passing on a charge that the verdict is the result of perjury is an appellate court warranted in interfering with the ruling. Calvin v. Lane, Mo.App., 297 S.W.2d 572, 575[3, 4]. Consult Williamson v. Wabash R. Co., 355 Mo. 248, 196 S.W.2d 129, 132 [7]. The other matters mentioned by defendants, relating to statements made to a defendant and a defendants' attorney and

variances between her testimony and that of other witnesses, go to her credibility and the weight to be accorded her testimony. Loveless v. Locke Distributing Co., Mo., 313 S.W.2d 24, 27[3–6]. This ruling also applies to defendants' contention that the testimony of Mrs. Askew is unbelieveable.

Fay Hildebrand testified that witness S. E. Bridewell stated in her presence: "Three are dead and one is dying." Mr. Bridewell testified he did not remember making this statement; and Mrs Bridewell, who was present, testified he said he thought one was killed and the others were pretty well broken up.

Defendants' lay witnesses at the scene were Roy Hightower, Mr. and Mrs. Paul Barker, Everett Clark, Homer Swift, Mr. and Mrs. James Davis, Joseph A. Fuchs, Orville Thompson, Royce Wilburn, and Eric Jones. We have hereinbefore mentioned the testimony with respect to Mrs. Pierce moaning or groaning while being moved from the car to the shoulder of the highway. These witnesses, with possibly only one or two exceptions, gave testimony to the effect that they did not hear Mrs. Pierce moan or groan, and observed no movement of Mrs. Pierce's body while she was on the shoulder, including any observation of her breathing or movement of her chest. Hightower stated he looked at Mrs. Pierce several times. Mrs. Pierce was viewed two or three times by Clark and Jones, three times by Wilburn and three or four times by Barker. Hightower, Clark, Mr. and Mrs. Barker, Fuchs, and Jones stated they had a good look at Mrs. Pierce. While Mrs. Pierce was lying on the shoulder, the witnesses mentioned below testified they observed no bubbles at Mrs. Pierce's nose or mouth (Hightower, Clark, Mr. Davis, Fuchs, Thompson), or any blood pumping or gushing from her ears (Hightower, Mr. and Mrs. Barker, Clark, Mr. Davis, Fuchs, Thompson, Wilburn, Swift), or any movement of her eyes (Hightower, Mr. and Mrs. Barker, Clark, Jones), or legs (Mr. and Mrs. Barker and Jones).

It is obvious that the lay witnesses did not see Mrs. Pierce at the same time and did not observe the same things. Defendants' witness Barker, on direct examination, testified that after they placed Mrs. Pierce on the shoulder he went back and he had her head in his hands at one time while Trooper Link was standing over him and when Barker said "she is gone," Link nodded his head. Link did not remember this. Barker also testified in chief that he noticed a small trickle of blood from Mrs. Pierce's nose, not enough to run to her mouth, and he wiped or dabbed the blood off, and he noticed a small bubble from her nose. On cross-examination Barker testified he "did wipe some blood from her nose"; "did see some bubbles in her nose," and that this occurred when he had Mrs. Pierce's head in his hands. Witness Davis stated Mrs. Pierce had a little dry blood where it looked like it had been wiped across her lip. Witness Clark observed that Mrs. Pierce was bloody at the ears, mouth and nose, and witnesses Mrs. Davis, Fuchs, Thompson, and Swift gave corroborating testimony.

Witnesses Barker and Clark testified Mrs. Pierce's eyes were open (Clark saying "they had a glare look"); but Mrs. Davis testified they were closed, and Mr. Davis stated they were "open a little bit; not too much."

Defendants' witness Hightower denied that, within two or three days after the collision and on different occasions, he told Lennie Watkins, Jr., a cousin of plaintiffs, and Mr., a cousin of plaintiffs, and Mrs. John Burris, and R. S. Roberts, an attorney for plaintiffs, in the presence of Mrs. L. S. Watkins, an aunt of plaintiffs, that when Mrs. Pierce and Mrs. Burris were loaded into the ambulance both women were alive. Lennie Watkins, Jr., testified witness Hightower did so tell him; and there was also testimony that witness Hightower made the same statement to Mr. and Mrs. John Burris, and also to R. S. Roberts in the presence of Mr. and Mrs. John Burris and Mrs. L. S. Watkins.

Defendants say the court erred in not permitting their eleven lay witnesses to testify that, in their opinion, Mrs. Pierce was dead.

Without developing the details, the substance of this situation is that defendants objected when plaintiffs' witnesses Link, Metcalf, and Bridewell were asked their opinions as to Mr. Pierce and Mrs. Pierce being alive or dead but withdrew their objection on the condition they be permitted to offer like testimony. (For instance, the court received, subject to the objections, Link's opinion that Mr. Pierce was dead when the witness could not feel Mr. Pierce's pulse at the car, and that Mrs. Pierce was alive after removal to the shoulder.) Plaintiffs' counsel stated: "Our research was that a layman can so testify as to his opinion whether a person is alive or dead by simply looking at them." Defendants' position was that if plaintiffs offered this proof they should be permitted to meet it and, if permitted to do so, would withdraw their objection. The court stated that it was the court's duty to pass on the qualifications of the individual witness when presented; that defendants would be permitted to withdraw their objection; and that a plaintiffs' objection made in like circumstances would be ruled when presented. Upon objections interposed by plaintiffs, the court excluded offered testimony by defendants' lay witnesses that Mrs. Pierce was dead when observed by them.

In Prudential Insurance Co. of America v. Spain, 339 Ill.App. 476, 90 N.E.2d 256, 259[3], under the Uniform Simultaneous Death Act, the court considered testimony by lay witnesses, stating facts, that one person appeared dead and the other alive was competent, reasoning that the subject matter of the proof was "something within the common knowledge of mankind." In that case, as in this, an expert witness testified that in the circumstances a stethoscope would have to be used to determine whether a severely injured person was alive or dead.

In a case involving deaths in a common disaster prior to the Uniform Act, the court considered a nonexpert witness not qualified to answer a like question. In re Loucks' Estate, 160 Cal. 551, 117 P. 673, 676[7], Ann.Cas.1913A, 868.

In Dorn v. St. Louis Public Service Co., Mo.App., 250 S.W.2d 859[2–4, 8, 9], it was held error to exclude certain x-ray reports from hospital records, portions of which had been introduced by plaintiff without a proper foundation for their admission, defendant not having objected. The court stated (865[2, 3]): "An objection to the admission of evidence is waived where the same or similar evidence has been adduced by the party objecting." And [4]: "The evidence which appellant sought to introduce was of the same hearsay character as that offered by respondent. Neither party made any attempt to qualify the records as evidence admissible under section 490.-680, RSMo 1949, V.A.M.S., and since respondent was the first to resort to hearsay in support of his cause, he is, under the circumstances, in no position to object to appellant meeting it with evidence of like kind. The doctrine of curative admissibility is applicable. [Citing authority.]" See also State v. Wilson, Mo., 320 S.W.2d 525 [3, 4]; Ramos v. Ramos, Mo.App., 232 S.W.2d 188, 197[4, 5].

The trial court was of the opinion the curative admissibility rule applied to factual testimony but not to opinion testimony where the court passed on the qualifications of the witness. In re Incorporation of Village of Elm Grove, 267 Wis. 157, 64 N.W.2d 874, 878[9], applied said rule to expert opinion testimony of an equally qualified witness.

■■ This is a court, not a jury, tried case. In this case each lay witness was questioned and testified to the facts observed upon which his opinion would be based. Opinion testimony ordinarily is not received where the trier of the facts is as capable as the witness of drawing con-

clusions from the facts proved. Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S.W. 2d 311, 322[16]; Hamre v. Conger, 357 Mo. 497, 209 S.W.2d 242, 248[9, 10]; Scanlon v. Kansas City, 325 Mo. 125, 28 S.W.2d 84, 95. We think under the curative admissibility rule and the position taken by the parties in the trial court that the opinions of defendants' lay witnesses of equal qualifications to plaintiffs' witnesses giving opinion testimony should have been received; but are also of the opinion that giving due consideration to the factual testimony, including inferences to be drawn therefrom, of the lay witnesses on the issue under discussion will accord to the parties all they are rightfully entitled to under the record before us.

Dr. John J. Connor, who had been City Coroner of St. Louis for about 26 years and had performed approximately 23,000 autopsies, performed an autopsy on Mrs. Pierce on November 13, 1958. (There was no autopsy on Mr. Pierce.) Some space in defendants' argument is devoted to discrediting Dr. Connor as a pathologist upon comparison with defendants' pathologists, Dr. John P. Wyatt, Professor of Pathology at St. Louis University, and Dr. James R. Teabeaut, Jr., Assistant Professor of Pathology at the University of Tennessee. Dr. Wyatt testified that Dr. Connor performed three or four autopsies a day and that he regarded Dr. Connor as competent. Dr. Connor considered Dr. Wyatt a well qualified pathologist. These expert witnesses were competent and the presentation does not call for a detailed discussion of their qualifications.

The most severe injury to Mrs. Pierce disclosed by the autopsy as testified to by Dr. Connor was "a fracture of the skull from the middle of the occipital bone around and forward to the left temporal and to the midline region." "It extended from the occipital around forward down to the petrous portion over toward the midline and stopped there," being "about six inches" long and separating the skull "about one-sixteenth of an inch." Additional frac-

tures were: right femur, above the knee; left leg, above the ankle; right arm, comminuted; left wrist, compound; second, third and fourth ribs, both sides anteriorly—linear. He found no fracture of the vertebrae. Mrs. Pierce did not have a broken neck. The heart and blood vessels, liver, spleen and kidneys appeared normal. There was blood in the trachea and bronchi. The specimens show blood in the lung tissue. Blood can be aspirated, breathed, into the lungs, but not if one dies instantly; or if a person be dead blood can reach the lungs by running down the trachea and bronchi, or as the result of a severe chest injury, or by a trocar lacerating or tearing the lung in embalming. Dr. Wyatt gave corroborating testimony on how blood could reach the lungs.

Dr. Connor testified the cause of Mrs. Pierce's death was the fracture of the skull, and "other probable possibilities" were the aspiration of blood into the trachea and bronchi causing strangulation, and also bleeding to death from the injuries received. His opinion was that Mrs. Pierce "didn't die instantaneously." His stated reasons were: The skull fracture did not extend into the foramen magnum where the cord joins the brain. There was no injury to the cord around the medulla. The skull fracture caused the death, but it was not severe enough to cause instant death. There was no injury to the spinal cord or the lungs severe enough to indicate instant death. There was no injury to the heart or great blood vessels. There was not enough blood in the trachea to cause her to suffocate. The blood in her lung tissues was breathed in, was a minute quantity, not enough to cause instantaneous death.

Dr. Connor also testified that Mrs. Pierce was alive if, while lying on the shoulder of the highway, she moaned or groaned, or had blood pumping from her ears, or had air bubbles and blood bubbles about her mouth and nose, or had air or blood bubbles that went up and down, increasing or decreasing on different occasions; or her

chest moved up and down, or her eyes batted, or leg moved.

Defendants contend the court erred in permitting Dr. John J. Connor to answer a hypothetical question. Plaintiffs say we should consider his answer. The question follows:

"Q. Doctor, assume first that a man's head is stretched upward and backward as the result of an impact of a steering wheel into his chin, assume his neck is broken at the base of the skull, assume that his throat had been lacerated or cut down to the esophagus, assume that some seven or eight hours later his neck was flexible, that it had to be held in position—based on that tell me in your opinion whether that man died instantaneously or not?"

Defendants objected "on the ground that there is no evidence to support the hypothesized fact of the steering wheel striking his chin and pushing his neck upwards and back, and there is no evidence of a tearing down to the esophagus, and sufficient facts are not hypothesized as a matter of law to permit the witness to state a reasonable medical opinion based on the facts related"; and that there was no hypothesis of how extensive the stretching of the neck was, and "nothing in the question concerning cord damage, and the terms used are general terms and not scientific terms."

"Mr. Roberts: He could testify on the basis of the throat slit to the esophagus. I believe a qualified witness could give an opinion on that alone.

"The Court: Overruled.

"A. I would say yes."

Then followed the cross-examination by Mr. James E. Reeves:

"Q. In the last question weren't you also assuming that there had been a severance of the spinal cord? A. And the fact that the esophagus was exposed. There would have to be an injury to the windpipe.

"Q. Although the spinal cord was not hypothesized? A. Either one could cause it.

"Q. Your opinion is based on your conclusion that there was a rupture of the spinal cord? A. Plus the other.

"Mr. Reeves: We move to strike his answer.

"The Court: Yes.

"Mr. Roberts: He said either one could cause death.

"The Court: I didn't understand him to say that.

"A. I said either one could cause instant death.

"The Court: All right. The motion to strike is overruled."

While counsel should exercise care that hypothetical questions be properly framed as to form and content, trial courts may exercise a sound discretion over such matters, and the omission of some facts or a violation of the general rules does not necessarily preclude an answer. Lang v. St. Louis-San Francisco R. Co., 364 Mo. 1147, 273 S.W.2d 270, 277[8, 9]. Rational inferences drawn from the testimony, as well as positive testimony, may form the basis for a hypothetical question. Heppner v. Atchison, T. & S. F. R. Co., Mo., 297 S.W.2d 497, 506[10]; Krug v. Mutual Life Ins. Co., 235 Mo.App. 1224, 149 S.W. 2d 393, 401[7]; Dillard v. East St. Louis R. Co., Mo.App., 150 S.W.2d 552, 556[6–8]. The question is not always improper because it includes only a part of the facts in evidence. It is sufficient if it is so framed as to reflect the theory of the party propounding it when it includes essential elements supported by facts and inferences of record. State v. Privitt, 175 Mo. 207[5], 75 S.W. 457[2, 3]; Zeller v. Wolff-Wilson Drug Co., Mo.App., 51 S.W.2d 881, 884[9]; the Dillard case, supra [7]. On appeal a party is held to the specific objections presented to the trial court. Burton v. Chi-

cago & A. R. Co., 176 Mo.App. 14, 162 S.W. 1064, 1067[7, 9]; the Zeller case, supra [7]; Denney v. Spot Martin, Inc., Mo.App., 328 S.W.2d 399, 402[2], citing cases.

■ Plaintiffs uphold this testimony on the ground that the lacerating or cutting of Mr. Pierce's throat down to the esophagus would cause his instant death; not on the fact Mr. Pierce's neck was broken. It can reasonably be inferred from Trooper Link's testimony that Mr. Pierce was sitting behind the wheel in a backward and upward position, his head and neck stretched back and up toward the top of the car, with a cut and blood on his mouth and chin; and Noel Dean's testimony that Mr. Pierce received a severe blow and a cut on the point of the chin, breaking and separating the jaw bone, into the mouth and under the tongue and to the esophagus, that the steering wheel struck Mr. Pierce's chin with great force and caused his head and neck to be stretched upward and backward. Dr. Connor stated that the trachea sets in front of the esophagus, and with the esophagus exposed you have to get beyond the trachea, which would be torn or fractured. The question, so far as specific objections were presented to the trial court, was based upon facts and reasonable inferences from facts in evidence. Other injuries received by Mr. Pierce were not essential to the opinion given. The testimony was that he was driving and the case was tried on the theory the parties were injured in an automobile collision. We conclude this testimony was for the consideration of the trier of the facts, in this case the trial court.

Dr. Teabeaut gave testimony to the effect that there was no way to tell from the injuries of Mr. Pierce assumed in the hypothetical question asked Dr. Connor whether the death was instantaneous or not.

Dr. Connor took specimens from Mrs. Pierce's lungs, the skin at the wrist wound and her spinal cord. Dr. Connor's office does not have complete laboratory facilities and the St. Louis University Department of Pathology technicians prepared his specimens. The nine paraffin blocks and ten slides prepared from these specimens were delivered to defendants.

Dr. Wyatt and Dr. Teabeaut testified no leucocytes, white blood cells, were found in the slides of the skin; and that their absence indicates there was no life after the injury and their presence indicates the existence of life.

Defendants' expert witnesses testified the slides of the lungs showed no white cell infiltration and no "mycoerythrocytes," large cells manufactured by the bone marrow, and that this indicated the absence of life in the lungs at the time of hemorrhage.

Dr. Wyatt testified the slides of the cord were from the upper cervical; that they showed about four changes; the presence of corpora amylacea, suggesting pre-senile softening of the cord; the separation of one-third of the cord from the other two-thirds with the presence of red blood cells in the covering and in the cleft separating the two portions of the cord; a piece of striated muscle near said cleft (which witness said could have reached there before death or after death in the postmortem); and the failure of the embalming fluid to well fix said one-third portion of the cord (which witness stated might have resulted from the fluid not reaching the proper vessels or from insufficient pressure); and these taken together indicated an ante-mortem injury, "occurring as an act of death. Q. Do you mean simultaneously with death? A. In my opinion it would contribute to death."

Dr. Teabeaut stated the cord specimen was from the region of cervical vertebra 2; that there were two separate cuts through the cord with red blood cells indicative of hemorrhage, without white blood cells, and a piece of voluntary muscle carried in from the back of the neck at the time of injury, the result of great force; and that the tear, hemorrhage and muscle driven into the cord at this level "would have produced instant death."

Asked a hypothetical question based on Mrs. Pierce's injuries and the witness's study and findings on the slides, Dr. Wyatt stated "these are the injuries one would associate with instantaneous death," and Dr. Teabeaut stated her death "was instantaneous." That portion of the question hypothesizing Mrs. Pierce's skull fracture to Dr. Teabeaut appears to conform to Dr. Connor's description of said injury, but reads, in the question propounded to Dr. Wyatt: " * * * a fracture of her skull commencing at the midportion of the occipital bone and going around the left forward into the parietal bone and curving on up over the top of the head to the midline and stopping there * * *."

There was testimony from one or the other or both of defendants' expert witnesses that the eyes of a dead person could close or bat after death; that sounds, a low moan, could issue or be made to issue from a dead person; that blood could pump and later ooze from a dead person by reason of the elastic tissue in the arteries and veins; and that a large air bubble at the nose, which gets larger and smaller, would not necessarily indicate life.

Dr. Connor stated the autopsy took about an hour and a half. Dr. Teabeaut stated it would have taken him four hours for this gross autopsy, two hours to prepare the specimens, and four hours to study them. We read Dr. Connor's answer to refer to the gross autopsy. Dr. Connor stated the skull fracture cut the meningeal artery within an inch of the ear and permitted the bleeding from the ear. Dr. Wyatt stated this was highly anatomically impossible. In Dr. Teabeaut's opinion it could not happen. Dr. Connor and Dr. Teabeaut differed on the weight of a heart, brain, kidney and lungs of a female of the size of Mrs. Pierce.

■ Dr. Teabeaut gave opinion testimony that, based alone on the slides of the spinal cord, Mrs. Pierce died instantaneously, and that the absence of white blood cells from the slides was proof positive that death occurred instantaneously. Defendants' references to the record do not establish that plaintiffs offered testimony in chief on these precise fact issues. The court received under § 510.310, subd. 1 the testimony hereinafter mentioned in rebuttal from Dr. John R. Roberts (who is not related to plaintiffs' counsel), Dr. William W. Tribby, both of whom qualified as pathologists, and Dr. C. F. Cain, a general practitioner, but considered the testimony not proper rebuttal. Plaintiffs contend this testimony is for consideration. Dr. Roberts testified that his examination of the slides disclosed white blood cells in every slide; and Dr. Roberts and Dr. Tribby each testified to the effect his examination of the slides, which included the slides of the cord, did not to the witness indicate instantaneous death. We think this testimony was proper rebuttal.

■ There was testimony from one or more of said rebuttal witnesses, including Dr. Cain, confirmative of Dr. Connor's testimony in chief to the effect it was not possible for the body of a dead person to have blood pump rhythmatically from the ear, et cetera, which was met by defendants' testimony to the contrary (all of which is set forth hereinabove). Notwithstanding the discretion in trial courts to admit or exclude rebuttal testimony, plaintiffs' authorities (Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161, 167[8]; Glenn v. Thompson, 228 Mo.App. 1087, 61 S.W.2d 210, 213) do not establish that plaintiffs were entitled as a matter of right to offer cumulative evidence in rebuttal or error in the trial court's ruling on this corroborative evidence (Peters v. Dodd, Mo., 328 S.W.2d 603, 610 [9, 10] and authorities cited).

In a case where the mother died just before the birth of the child, testimony of doctors and nurses that the child gurgled and died in a minute or two was sufficient to establish that the child was alive and survived the mother. Taylor v. Cawood, Mo., 211 S.W. 47, 51. In an automobile case, the testimony of two lay witnesses who arrived at the scene within a few min-

utes of the collision to the effect that the wife's body was twisted as if she had a broken back and showed no heart beat and the husband's heart beat was perceptible and his bleeding from a "cracked open" head occurred in spurts, was held to establish the survivorship of the husband, and the trial court's holding of "no sufficient evidence" of survivorship was reversed. Sauers v. Stolz, 121 Colo. 456, 218 P.2d 741, 742[3]. In a case where the husband and wife perished in a fire, the testimony of the wife's brother that when he arrived he touched the wife and she was breathing and the husband's body was cold to the touch and he was not breathing was sufficient to establish the survivorship of the wife. Saligman's Estate, 13 Pa.Dist. & Co.R.2d 432, 434. In the above cases there was no conflicting testimony. See also Prudential Ins. Co. of America v. Spain, 339 Ill.App. 476, 90 N.E.2d 256; In re Davenport's Estates, 79 Idaho 548, 323 P.2d 611; Thomas v. Anderson, 96 Cal.App.2d 371, 215 P.2d 478; Smith v. Smith, Ark., 317 S.W.2d 275; White v. Taylor, 155 Tex. 392, 286 S.W.2d 925. In Adams v. Gardener, 241 Mo.App. 275, 237 S.W.2d 495, there was no sufficient evidence that the parties died otherwise than simultaneously.

Black's Law Dictionary, 4th Ed., defines death as "The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation etc." Quoted in Thomas v. Anderson and Smith v. Smith, supra.

The trial court accorded to plaintiffs' witnesses the greater credibility on this record of conflicting testimony. The court could find that Mr. Pierce had no pulse when Trooper Link tried to take his pulse in the car; that while on the shoulder his head was twisted completely out of line with his body, and Mr. Pierce's body, including his head, was completely covered with a blanket when Hightower brought the blankets; that while on the shoulder

Mrs. Pierce's head and face were never covered; that she was bleeding from the ears, nose and mouth; that Trooper Link tried but was unable to stop the bleeding; that he wiped blood from her face; that blood pumped rhythm-like from her ears; that bloody air bubbles, which would get big and small, come and go, appeared at her nose, one appearing at her mouth and bursting when the ambulance arrived about 20 to 30 minutes after the collision; that her eyes closed and she was heard to moan or groan while on the shoulder, and that blood had stopped flowing and had dried on Mr. Pierce while Mrs. Pierce was still bleeding. We conclude the trial court could find plaintiffs met the burden resting upon them by substantial evidence of survivorship; and giving due deference to its findings, based on the credibility of the witnesses, the record does not establish that the judgments are clearly erroneous.

Plaintiffs filed a motion to dismiss defendants' appeal. Let it stand overruled without prejudice.

The judgments are affirmed.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court en banc.

All concur.

On Motion for Rehearing

PER CURIAM.

Defendants have filed a motion for rehearing or, in the alternative, for transfer to Court en Banc in which they state we have given no indication that we reviewed this case de novo, or that we gave any consideration to the opinion evidence of lay witnesses offered by defendants and which we considered in the circumstances of record had been wrongfully excluded by the trial court. It is to be recalled that defendants' lay witnesses testified to the facts they observed upon which they based their ex-

cluded opinions. This was also true of plaintiffs' lay witnesses giving opinion testimony. We thought we had covered these matters in the second paragraph of the opinion, in the closing paragraph of our discussion of the issue involving the exclusion of the offered testimony of the opinions of defendants' lay witnesses, and at the close of our opinion.

■ This case is a court tried simultaneous death case under "The Uniform Simultaneous Death Act" adopted in Missouri. See §§ 471.010, 471.030, 471.070, cited and quoted in the opinion, and § 471.-080. We perceive no escape from the observation in the opinion that sufficient proof of survivorship for a short time, if only one second, would serve to permit the survivor to act as a conduit of title to his or her heirs under said Uniform Act.

Counsel are mindful of the statutory admonition (§ 510.310, subd. 4) in cases tried upon the facts without a jury that "the judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■ The opinion discloses and the parties recognize that the testimony, factual and opinion (including the opinion testimony of lay witnesses admitted and opinion testimony of lay witnesses offered but excluded) was in irreconcilable conflict on the essential fact issue involved. We find nothing in defendants' offer of proof with respect to the opinions of their lay witnesses that would change the result reached, which is the determination of this appellate court of this court tried case upon a review de novo under the law on the whole of the record before us; and therein we gave consideration to said offers of proof by defendants. The function of courts is to apply the law to the facts and not to rewrite the statutory law of the state.

We have reviewed the other matters presented in defendants' motion and adhere to our rulings in the opinion.

The motion for rehearing or in the alternative to transfer to Court en Banc is overruled.

PER CURIAM: The foregoing per curiam opinion is adopted as the opinion of the court en banc.